Edmond JACKSON, Petitioner,

v.

Walter FOGG, Superintendent, Green Haven Correctional Facility, Respondent.

No. 77 Civ. 3284 (VLB).

United States District Court, S. D. New York.

Aug. 25, 1978.

Helen Bodian, Prisoners' Legal Services of New York, New York City, for petitioner.

Robert Abrams, Atty. Gen. by Thomas S. O'Connor, New York City, for respondent.

VINCENT L. BRODERICK, District Judge.

## I.

This is a petition for writ of habeas corpus under 28 U.S.C. § 2254. The petitioner, Edmond Jackson, is currently imprisoned at the Green Haven Correctional Facility in the State of New York. He was convicted, after a jury trial, of murder, felony murder, attempted robbery in the first degree, and possession of a weapon, and sentenced to two terms of twenty years to life, a term of three to fifteen years and a term of three to seven years, all terms to be served concurrently. The Appellate Division, Second Department, and the New York Court of Appeals both affirmed the conviction without opinion, *People v. Jackson,* 40 A.D.2d 1081, 337 N.Y.S.2d 1005 (1972), *aff'd,* 35 N.Y.2d 856, 363 N.Y.S.2d 580, 322 N.E.2d 272 (1974).

Petitioner here advances three claims: (1) that the trial testimony of three of the four eyewitnesses to the crime was tainted by an overly suggestive pre-lineup procedure; (2) that petitioner should have been allowed to conduct a new lineup so that the eyewitnesses could have had the opportunity to identify another suspect; and (3) that petitioner was unfairly and prejudicially surprised at trial as a result of a New York statute which required defendants to give notice of their intended alibi witnesses, but did not require the prosecution to give notice of alibi rebuttal testimony.

Since I find that the trial testimony of three witnesses was tainted to a constitutionally impermissible degree by pre-trial "show-ups," I grant the petition. I also grant the petition on the basis of the application to petitioner's trial of New York's alibi statute, N.Y.C.C.P. § 295–*l.*

## II.

### 1. *The Killing at Harvey's Lounge.*

The crimes in question occurred on June 14, 1970 in the middle of the night in a crowded but well-lit bar—Harvey's Lounge—on Sutphin Boulevard in Jamaica, Queens. Four witnesses who would later identify petitioner as the perpetrator were inside the bar, together with 40 to 60 other people. Joseph Webb tended the bar. Mary Phifer, Edward Byrd, and Willie Johnson were customers sitting at the bar within 10 feet of the door. About 1:30 in the morning a man holding a gun and standing near the door announced, "This is a stick up." The gunman's words threw the Lounge into an uproar as the screaming customers rushed to the back of the bar. In the midst of the commotion, the gunman strode to the bar, levelled his pistol and fired once, wounding Harold Dixon, who, along with Webb, had been tending the bar. Dixon died ten days later.

### 2. *The Investigation.*

Detectives William Cash and Harold Cannon of the New York City Police Department arrived at the scene shortly after the shooting took place and began an investigation. Since the gun was never recovered and no relevant fingerprints could be found, the detectives focused their attention on persons they identified as eyewitnesses—Phifer, Johnson, Byrd and Webb. The record does not indicate whether, apart from those four who testified, any of the 40 to 60 persons in the Lounge at the time of the incident had an opportunity to observe the gunman.

The four eyewitnesses gave varying estimates as to the amount of time each of them had had to observe. None of them had ever seen the gunman before that night.

Webb testified at the *Wade* hearing that he had observed the gunman for "about maybe two, three seconds or [a] minute— might have been a minute." (*Wade* Hearing ("H") at 7). At the trial he stated that after the shot, he dived behind the bar and crawled to the rear. (Trial Transcript ("T") at 181–82).

Mary Phifer was sitting at the bar next to Willie Johnson with her back to the door. She heard the gunman announce the holdup, turned, saw the man holding the gun, and nudged Johnson. Johnson then pushed

**180**

her to the floor of the bar and told her to "[m]ake it to the bathroom." (T. 66–69). She went straight to the bathroom and arrived there before any of the other patrons (*Id.*). She claimed to have observed the gunman for between eight and fifteen seconds (T. 71, H. 63).

Willie Johnson testified that he heard the gunman's words, turned and saw the man holding the gun, immediately knocked Phifer off her stool and then hurried out of harm's way. At various times he claimed to have observed the man for periods of from two (T. 142) to 60 (H. 79) seconds, but he stated at one point that he "couldn't say how long it was" (T. 163).

Edward Byrd testified that he had "glanced at" the gunman in the bar 15 minutes before the shooting took place (T. 162). When the holdup was announced, Byrd turned, observed the gunman for four or five seconds, and ran to the back of the bar. He was lying on the floor when the shot rang out (T. 120–22).

Over the next several days, after the incident, the four eyewitnesses were shown a large number of mugshots. Finally on June 14, 1970, Mary Phifer selected two pictures of men who, she said, "strongly resembled" the gunman. Johnson, Byrd and Webb later confirmed Phifer's reaction.

The pictures were of a "Veryl Walker" and a "John Walker". Although John Walker was in prison at the time of the shooting, the identification of Veryl Walker provided an apparently promising lead. On June 16, an informer told Detective Cash that a man named "Snake" had committed the murder. He also said that "Snake" and Veryl Walker were the same person. Cannon made one visit to an address given by the informant in an unsuccessful effort to find Walker, but he ended his efforts on the day that Edmond Jackson was apprehended.

### 3. *The Lineups.*

Petitioner was identified in two successive lineups by the four eyewitnesses on July 13, 1970 at a stationhouse in Queens. How the petitioner got there and how the eyewitnesses happened to be at the stationhouse is not entirely clear, due in major part, to contradictory testimony from the detectives, Cash and Cannon, who were together throughout the day (H. 134–35, 161, 167, 185, 190).

At the *Wade* hearing, which was held (on the day before petitioner's trial) to establish whether there were any improprieties regarding the identification process, Detective Cannon testified that he and Cash "happened to be cruising around in the neighborhood" where petitioner lived (H. 134). They were not "working on any information that lead . . . to Edmond Jackson" (H. 158). The two bumped into Jackson, and Cannon struck up a conversation. Petitioner said he was looking for a tenant for his house in hopes of easing the mortgage payments. Cannon suggested that they go down to the stationhouse and call an acquaintance of Cannon's who might be interested in leasing. (H. 159). Arriving at the station, the two detectives and petitioner walked up the stairs and into the detective room. According to Cannon, just inside the door of that room sat Webb, the bartender who had been at the lounge on the night of the shooting and who had been cooperating with the police in the investigation. The detectives and petitioner walked directly past Webb and into a back room (H. 135). Webb then called Detective Cash back into the outer room and informed him that petitioner was the gunman. (H. 164). Cannon testified that Webb said that he "came up to see if anything had developed in the case" (H. 167). Petitioner, again according to Cannon, was placed under arrest and was given the *Miranda* warnings (H. 136–38).

At trial, Cannon told a different story. He then said that he and Cash were actively seeking Jackson in relation to the investigation (T. 222–23). But moments later, confronted with his *Wade* testimony, Cannon acknowledged that they had no information about Jackson "with reference to a crime." (T. 224).

An explanation for the discrepancies in Cannon's testimony may lie in the fact that Cannon had the benefit of hearing Detective Cash's *Wade* hearing testimony before giving his trial testimony. Cash, who did not appear at the trial, testified that he and Cannon had driven to Jackson's house "to further conduct this homicide investigation and talk with Jackson" (H. 189). Cash had previously contacted Webb and "other people" and had asked them "to stand by" in case they had to be called in to view a lineup (H. 182).

Cash's description of the initial conversation with petitioner (regarding Jackson's desire to find a tenant) was similar to that of Cannon (H. 134). Once in the car, according to Cash, petitioner was advised that he was under suspicion of criminal activities and was informed of his *Miranda* rights (H. 180–81). Upon arrival at the stationhouse petitioner was told that he was suspected of committing the Harvey's Lounge murder. Petitioner denied having ever been at Harvey's Lounge (H. 182–83).

Cash made no mention of the encounter with Webb, so carefully described by Cannon. He said that he did not see Webb until sometime after the three had arrived at the stationhouse (H. 185), and that Webb did not say anything to him (H. 186). After the petitioner had been questioned briefly, "the witnesses in question were phoned and told to appear at the stationhouse" (H. 183). Cash also said that he did not bring any witnesses to the station that day to identify Jackson (H. 201). This brings us to Edward Byrd's *Wade* hearing testimony.

On July 13th, the day of the lineup, Byrd had stopped by Harvey's Lounge on his way home from work. He testified that Detectives Cash and Cannon picked him up at the bar and drove down to the stationhouse (H. 132). On the way, Cash told Byrd that "he found the fellow who shot Harold Dixon" (H. 133). Arriving at the stationhouse, the detectives escorted Byrd into their office. Once in the office, Byrd noticed the petitioner sitting by himself in a back room. Spotting him through the "two-way glass," Byrd identified Jackson as the gunman. (H. 116–117).

Webb's account of the pre-lineup events also differed from that given by the detectives. Webb testified that a police officer called and asked him to come to the station "to see if I could pick out the individual who did the shooting" (H. 43). Arriving at the station, Cash met Webb and escorted him to the detective room. While walking with Cash, Webb said that he spotted and identified the petitioner, who was sitting 15–20 feet away, as the gunman.

Willie Johnson, the third eyewitness, had two opportunities to observe petitioner before the lineup ceremony. Johnson arrived at the station around 3:30 or 3:45. He came in response to a message, left at his home, to the effect that the police "had somebody down there that they wanted me to look at in a lineup" (H. 96). Johnson got to the stationhouse and went to a waiting room near the detectives' office. From that vantage point he noticed petitioner in an adjoining room (H. 97). A short time later, Detective Cash and the petitioner walked directly past Johnson as he sat in the waiting room (H. 100). Following that, Cash told Johnson that a lineup would be held and that Johnson would be asked if he could recognize any of the suspects (H. 101).

Mary Phifer was taken to the station in the early evening of July 13. She did not see the petitioner until the lineup procedure was underway.

Two lineups were held on July 13, both of them composed of the same six black men. In both lineups the four witnesses picked Jackson out as the gunman.

### 4. *The Wade Hearing.*

At the *Wade* hearing, all four witnesses described the gunman in virtually identical terms. (H. 35–36, 52, 65, 80, 115, 127). He was a light-complexioned negro of medium build, about 5'8", wearing tan pants and a gold shirt and sporting a "slight" (or "light") moustache. All four characterized the gunman's haircut as being a "semi-Afro." All four identified Jackson at the *Wade* hearing as being the gunman.

Police reports indicated that Mary Phifer did not report seeing a moustache on the night of the crime, and the description issued by the police, which was based on descriptions given by various people at the bar that night, also made no mention of a moustache. (T. 204). It did, however, conform on the whole to the description given by the four witnesses at the *Wade* hearing.

At the close of the *Wade* hearing, the court ruled that the identification procedure was not impermissibly tainted by suggestive activity on the part of the police, clearing the way for the subsequent in-court identifications. His ruling on this point, made on the record soon after the hearing had ended, reads as follows:

> The people in the lineup was proper the Court holds. It was a proper lineup. The identification for the lineup was proper.
>
> However, there is a further question in the entire situation. Three of the witnesses; namely, Webb, Johnson and Byrd, all testified that they saw the defendant seated in the police station before he was taken to the lineup.
>
> Query: Would that fact render a situation where there would be a tainted identification before the Court?
>
> Webb stated that this defendant was some fifteen or twenty feet away and seated with someone else when he saw them. And no mention was made to him and nothing was stated to him concerning the identification by any police officer. But he did make this identification voluntarily.
>
> And the same held good for Johnson and Byrd.
>
> Of course, the thought arises with the Court whether the police had planned this, whether the police had planned for this defendant to be there at the time.
>
> I think the situation was highly unusual. And the Court during the luncheon recess read through the minutes which you were kind enough to have printed, and there is absolutely no testimony that this was planned—which entered my mind.

> Therefore, the Court holds—and I say there was a very, very serious question before the Court, and I did a lot of deliberation on it, and I was very concerned about it. But after reading all the testimony and going through it I will hold that the identification was proper and would not so contaminate an in-court identification.
>
> Let's proceed.

(H. 203–204).

Petitioner's attorney then called the court's attention to the fact that Byrd was specifically told beforehand that he would be asked to identify Dixon's murderer. The court answered:

> I appreciate your argument. But he said that at the place. But there is no showup as we know a showup. He just happened to be sitting there. No one said there was anyone else there. There were other people around.

(H. 206).

Petitioner's counsel then suggested that the police had "contrived the scheme" (*Id.*). The court answered:

> The main point in this whole issue is would it so contaminate the testimony; and I think it won't. Even if what you say would be true, I don't think it would.

(*Id.*).

Petitioner's attorney asked the court to consider the "complete divergence" between the police officers' testimony (*Id.*). The court declined to do so:

> Counselor, as I say, it comes down to one question: would the identification of the independent source; namely the place where it happened, be tainted by this testimony? And I think it won't.
>
> Let's proceed with the trial.

(H. 206–207).

The foregoing constitutes the entire findings of the trial judge regarding the issues raised at the *Wade* hearing.

### 5. The Identifications at Trial.

The trial court did have one more opportunity to comment on the *Wade* proceeding. This occurred at trial.

During the redirect examination of eyewitness Mary Phifer, the district attorney questioned her regarding her previous identification. Counsel for petitioner objected on the ground that it would merely tend to bolster Phifer's in-court identification and would therefore be overly prejudicial (T. 89). The trial court allowed Phifer—the only eyewitness who did not see Jackson in the stationhouse before the lineups—to testify as to her previous identification, but excluded testimony by the other three eyewitnesses with respect to the lineup identifications: He ruled as follows (after hearing oral argument from both sides):

> THE COURT: I am going to allow a lineup identification just for this witness and for none of the other witnesses—just for this witness alone—because we had a *Wade* hearing, and the other witnesses testified they saw this Defendant sitting in the police station before they went in to the lineup. Therefore, I am disallowing the other identifications in the lineup.
>
> However, I held in my original decision that even that did not taint the out of Court—
>
> [ASSISTANT DISTRICT ATTORNEY]: In Court.
>
> THE COURT:—identification for the in-Court identification for the other witnesses. However, I will not let him go into the lineup identification—
>
> [ASSISTANT DISTRICT ATTORNEY]: Just for the record, I had no intention of doing it with the other three witnesses anyway.

(T. 90).

At trial, all four eyewitnesses identified petitioner as the man who shot Harold Dixon (T. 38, 123, 145–46, 173–74).

### III.

*Identification Procedures*

1. *Requirement of Findings and the Presumption of Correctness.*

Preliminarily, the respondent urges that the findings of the state trial judge after the *Wade* hearing are entitled to the presumption of correctness found in 28 U.S.C. § 2254(d). That section reads in pertinent part:

> (d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct . . . . .

In *LaVallee v. Delle Rose*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973), the Supreme Court held that a written opinion which summarized the evidence at a *Huntley* hearing in such a way as to indicate to the court that the state judge applied the correct standard and considered the proper elements was entitled to presumptive weight.[1] The Second Circuit has interpreted *Delle Rose* as holding that it "is only where 'it can scarcely be doubted' that the relevant factual issues have been resolved against the petitioner *and* that 'there is no evidence that the state trier utilized the wrong [legal] standard,' that § 2254 requires the habeas court to dismiss a subsequent petition without an independent evidentiary hearing. *LaVallee v. Delle Rose*, 410 U.S. 690, 692, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973)." *United States ex rel. Williams v. LaVallee*, 487 F.2d 1006, 1011 (2d Cir. 1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974) (emphasis and brackets in original). The Second Circuit in *Williams* made it plain that "the habeas court must itself insure that the relevant facts were found and that the correct legal standard was applied to them." *Id.* at 1010. Accordingly, the Second Circuit ordered the district court to hold a hearing where the state trial court "did not focus, and did not make specific findings on [important] factual questions . . . ." *Id.* at 1011.

---

1. Four justices joined a strong dissent on the ground that the state judge had not adequately explained his conclusions. 410 U.S. at 695–701, 93 S.Ct. 1203 (Marshall, J., dissenting).

The other cases cited by respondent reflect the proposition that state court findings are entitled to considerable weight. *United States ex rel. Pella v. Reid*, 527 F.2d 380, 384 (2d Cir. 1975); *United States ex rel. John v. Casscles*, 489 F.2d 20, 25 (2d Cir. 1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974); *United States ex rel. Phipps v. Follette*, 428 F.2d 912, 915 (2d Cir.), *cert. denied*, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970). But it is clear from these cases, as it is from *Delle Rose* and *Williams*, that the district court must satisfy itself that the state judge came to his conclusion by finding the pertinent facts and by applying the proper standard to the facts so found. Clearly, this is the objective sought by the § 2254(d) requirement of written findings.

■ A finding made on the record at the conclusion of a hearing is, for all practical purposes, the equivalent of a written finding. However, to be accorded substantial weight, such a finding must be sufficiently clear to be reviewable. Findings must be expressed or clearly inferable to enable a reviewing court to ascertain whether correct legal principles were applied by the state court. *See Townsend v. Sain*, 372 U.S. 293, 313–314, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

In cases involving pre-trial identification, the Supreme Court has set forth precise factors which must be taken into account in determining whether the accused has been deprived of his constitutional right to have proscribed any unreliable in-court identification that results from suggestive police procedures. A review of Justice Dubin's conclusions must await a fuller discussion of these factors and of the case law in the area.

2. *Pre-trial Identification.*

In the Supreme Court's various decisions in the area of pre-trial identification procedures, from *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), to *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), to *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22

L.Ed.2d 402 (1969) to *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), to *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1973), to the most recent pronouncement, *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Court's chief concern has been the problem posed by courtroom identification testimony which was the possible product of a suggestive pre-trial identification procedure. *Manson, supra*, at 111, 97 S.Ct. 2243. The Court's decisions have sought to forge standards which a) will ensure that the testimony given is reliable and not so tainted by suggestive procedures as to make it likely that the witness has replaced the image of the perpetrator with that of the accused, and b) will serve as a deterrent to police misconduct. *Manson v. Brathwaite, supra*, at 112, 97 S.Ct. 2243.

■ In deciding whether or not to permit a witness to make an in-court identification, a two-step process must be employed. The court must determine whether the pre-trial identification procedures employed were in fact suggestive. If it determines that those procedures were suggestive, the court must then determine whether the identification to be made at trial was so tainted by the suggestive procedures as to be rendered unreliable, and therefore inadmissible. At this second stage, the court must evaluate the "totality of the circumstances" in light of five distinct factors—"the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation," *Neil v. Biggers, supra*, 409 U.S. at 199–200, 93 S.Ct. at 382, and determine whether there exists "a very substantial likelihood of misidentification." *Id.* at 198, 93 S.Ct. at 381, *quoting Simmons, supra*, 390 U.S. at 384, 88 S.Ct. 967.

A. *Suggestiveness*

Petitioner contends that the circumstances surrounding the pre-trial identification

lineups were suggestive. He insists that much of the *Wade* and trial testimony supports the conclusion that the police made sure that the eyewitnesses would make positive identification, initially by "priming" the witnesses in telling them that they were going to be asked to identify the Harvey's Lounge gunman, and thereafter by exposing petitioner to three of the eyewitnesses prior to the lineup. The lineups, he contends, merely strengthened the erroneous impressions made earlier.

Petitioner notes that Justice Dubin, in his remarks after the *Wade* hearing, characterized the testimony as posing a "very, very serious question" as to whether the police had manipulated the petitioner and the eyewitnesses in such a way as to elicit unwarranted identifications (H. 204). He also points out that Justice Dubin later excluded from the trial all testimony regarding the out-of-court identifications of the three witnesses in question "because we had a *Wade* hearing, and the other witnesses testified they saw this Defendant sitting in the police station before they went in to the lineup." (T. 90). Petitioner urges that this ruling compels the conclusion that Justice Dubin held that the stationhouse confrontations were suggestive enough to bar any evidence of them at trial, but not so damaging as to preclude the three eyewitnesses from making in-court identifications at trial.

The fact of the stationhouse identifications left petitioner in a fairly unsatisfactory position at trial. Petitioner could probably have demanded and received the right to examine the witnesses about the suggestive identifications, but to do so would have revealed to the jury that petitioner had already been identified four times by three of his four accusers before trial (the suggestive confrontation, the two line-ups and the *Wade* hearing). In foregoing this avenue, however, the petitioner was unable to show that the identification testimony, upon which the prosecution case rested, was infected by suggestive pre-trial confrontations.

The procedures used in petitioner's case are similar to others which have been categorized as "suggestive" in various Supreme Court and Second Circuit decisions. In *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the petitioner was identified by a rape victim at a stationhouse "show-up" that took place seven months after the rape. The police asserted that petitioner's unusual physique necessitated the "show-up" since they had been unable to locate individuals of similar age and build despite a fairly diligent search. The Court labelled the procedure "suggestive." *Id.* at 199, 93 S.Ct. 375.

The Court frowned on the hospital room "show-up" used in *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), but found it acceptable only because the eyewitness was in danger of dying before a lineup could be arranged.

The Second Circuit has characterized the "show-up" as impermissibly suggestive. Thus in *United States ex rel. Lucas v. Regan*, 503 F.2d 1 (2d Cir. 1974), the court implicitly found the "show-up" there employed to be impermissibly suggestive, but applying the *Biggers* factors, allowed the conviction based on the witness's in-court identification to stand. *Id.* at 4. The same analysis was used under somewhat analogous circumstances in *United States ex rel. Carnegie v. MacDougall*, 422 F.2d 353, 354 (2d Cir. 1970) (per curiam) (show-up), and in *United States ex rel. Rutherford v. Deegan*, 406 F.2d 217 (2d Cir. 1969) (petitioner, black, spontaneously identified while sitting among white detectives).

■ In this case, the evidence indicates that the police arranged to have the various eyewitnesses on hand at the stationhouse when petitioner was brought in, that three of the witnesses were afforded a pre-lineup opportunity to see, and in fact did see, the petitioner either alone or in the company of detectives whom they knew to be working on the Harvey's Lounge case, and that the police were, at the very least, grossly negligent in allowing the show-ups to take place. This evidence leads me to find that the procedures, to put it most charitably, were "impermissibly suggestive."

This finding leads to inquiry as to whether, under the totality of the circumstances, the courtroom identifications were reliable.

## B. Reliability

As noted previously, the search for reliability entails weighing the evidence in the light of the five *Biggers* factors. In this case, it would be appropriate to note whatever findings Justice Dubin made in regard to each of these factors.

(1) *The opportunity of the witness to view the criminal at the time of the crime.* Although the testimony on this point was both extensive and crucial, Justice Dubin made no finding.

I note first the time and the locale of the crime: 1:30 a. m. in a crowded bar—a drinking establishment.[2]

The testimony describes pandemonium at the crime scene as the customers scrambled for safety during the short interval when the gunman was present in the bar. The lateness of the hour, the crowded conditions and the confusion that reigned suggest that the witnesses had little opportunity and less motivation to examine the perpetrator's features.

Respondent asserts that the eyewitnesses had sufficient time and opportunity to observe petitioner and cites a number of Second Circuit cases in support of this view. He relies chiefly on *United States ex rel. Phipps v. Follette*, 428 F.2d 912 (2d Cir.), *cert. denied*, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970), where the eyewitness, who had twenty to thirty seconds to observe the robber in early morning daylight, made positive identification of the petitioner one hour after the incident took place. Since no findings were made in the case at bar relative to the amount of time the witnesses had to view the gunman at the scene, there is no way of telling whether the witnesses had one or sixty seconds to view the assailant; the evidence could conceivably support either figure. It is clear, however, that the eyewitness in *Phipps* was directly involved with the criminal and was not scrambling for cover. The *Phipps* witness was a true victim within the meaning of *Biggers* and *United States v. Mims*, 481 F.2d 636 (2d Cir. 1973), and thus, as those courts have noted, was more likely to retain the image of the assailant's face. Although, as respondent asserts, the witnesses in this case were *potential* victims, they were not victims within the meaning of *Phipps* and *Biggers*: they were not singled out by the perpetrator as the objects of his criminal design. They were bystanders positioned in or near the line of fire with no interest in memorizing the gunman's features and every interest in fleeing the vicinity.

The other cases cited by respondent are distinguishable on other grounds. Thus *United States v. Yanishefsky*, 500 F.2d 1327 (2d Cir. 1974), involved a photographic display that followed a brief viewing of the perpetrator's profile. The Second Circuit, reviewing the findings of the district court, merely noted that "there is no evidence in the record indicating that [the witness'] view of [the criminal] was inadequate for [the witness] to formulate a clear visual and mental impression of [the criminal]." *Id.* at 1330. Here, aside from the fact that there is no finding to review, the record discloses a good deal of evidence to the effect that the conditions for observation were less than ideal.

Similarly inapposite is *United States ex rel. Cummings v. Zelker*, 455 F.2d 714 (2d Cir.), *cert. denied*, 406 U.S. 927, 92 S.Ct. 1800, 32 L.Ed.2d 128 (1972), where the witness was afforded an unobstructed and unhurried opportunity to observe the petitioner for fifteen seconds while the petitioner stood in the backyard bathed in broad daylight.

---

2. The eyewitnesses testified to periods they had been in the bar at the time of the shooting, and with respect to their consumption. Byrd stated he had been in the bar 15 minutes and drank only 7-Up (T. 118); Johnson said he had been there 45 minutes and was served one drink, which he did not drink (T. 141); Phifer said she had been in the bar for an hour and had one drink (T. 34–35); and Webb, who was one of the bartenders, said he had nothing to drink (T. 170–171).

' (2) *The witnesses' degree of attention.* Again, Justice Dubin offered no finding on this issue.

Much of the prior discussion has underscored that the atmosphere in Harvey's Lounge at the moment of the crime left little room for detached and reflective observation. Furthermore, as has also been pointed out, the witnesses were not victims within the meaning of *Biggers* and *Follette.* The witnesses were motivated, not to observe and remember the gunman's features, but rather to escape the line of fire as quickly as possible.

(3) *The accuracy of the witnesses' prior descriptions.*

Again, Justice Dubin made no findings of fact on this issue, possibly because the evidence was scant. Although the police issued a description of the killer drawn from the accounts given by various people at the bar (T. 219, H. 172), the record does not indicate the specific descriptions, if any, given by the three witnesses in question.

While all of the eyewitnesses testified at the *Wade* hearing that they remembered the killer as wearing a moustache, the general description issued by the police immediately after the crime, presumably reflecting the descriptions then furnished by the eyewitnesses, made no reference to a moustache.

(4) *The level of certainty demonstrated by the witnesses at the confrontation.*

Justice Dubin found that Joseph Webb was sitting some fifteen to twenty feet from petitioner when he noticed him, that he was not told that the police suspected petitioner, and that his identification was made voluntarily (H. 203). Although the circumstances of the confrontations involving Byrd and Johnson were different (Johnson, for example, saw petitioner twice before the lineup and did not report any identification of petitioner to the detectives on either occasion), Justice Dubin merely stated that "the same held good for Johnson and Byrd." (H. 203).

Although Webb testified to a high degree of certainty (H. 78–80), Johnson made no independent identification after either of the two show-ups at the stationhouse when he saw petitioner. Byrd's identification appears to have been communicated fairly quickly (H. 116), and therefore a substantial degree of certainty can be inferred.

(5) *The length of time between the crime and the confrontation.*

Justice Dubin made no mention of the one month delay between the incident and the show-ups nor of the consequent possibility that the witnesses' memories had faded to the point where the original image of the criminal had grown indistinct, to be replaced by the suggestively proffered image of the petitioner.

3. *The Due Process Implications of the Pre-Trial Identifications.*

 Justice Dubin having failed to make any findings in most of those crucial areas, I proceed to make my own findings on the record before me. In so doing I note that, except for the identifications, not a scintilla of evidence was offered at the trial to connect petitioner with the crime. Had there been independent corroborating evidence of petitioner's guilt apart from the various identifications (see *United States ex rel. Phipps v. Follette,* 428 F.2d 912, 916 (2d Cir. 1970)), or had the show-ups been less likely to produce unreliable identifications, I might have been more willing to defer to the state court. On the facts of this case, however, the reliability of the eyewitnesses' testimony could hardly be more crucial.

After a careful examination of the *Wade* hearing and trial transcripts, I find (1) that the witnesses did not have a good opportunity to view the gunman at the time of the crime; (2) that the witnesses had little motivation to study the gunman's face and every reason to turn and run; (3) that no evidence now before the court gives any definite indication of how the three witnesses in question initially described the gunman (and that therefore, no firm basis for comparison exists); (4) that the witnesses appeared to have displayed varying degrees of certainty at the stationhouse; and (5) a considerable amount of time (one

month) had elapsed between the time of the crime and the time of the confrontation.

I conclude that the stationhouse procedures were suggestive, and that the identification testimony of three of the four eyewitnesses was irreparably tainted thereby. The procedures were so suggestive, in fact, that they gave rise "to a very. substantial likelihood of irreparable misidentification" (*Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)) to the degree that permitting these witnesses to make in-court identifications constituted a denial of due process. *See United States ex rel. Phipps v. Follette,* 428 F.2d 912, 914–15 (2d Cir. 1970). Petitioner's conviction on the basis of that testimony cannot stand.[3]

## IV.

### *The Non-reciprocal Alibi Statute*

Petitioner claims that due process was violated by the application of New York Code of Criminal Procedure § 295–*l*, which required petitioner to disclose to the prosecution his intended alibi witnesses but imposed no reciprocal duty on the prosecution to give notice of any intended rebuttal witnesses.

(1) *The Alibi, and the Rebuttal Evidence.*

Petitioner called three alibi witnesses at his trial, all of whom testified that petitioner was at his home on the night of June 14.

George Carter testified that he was a friend of petitioner, that he worked for the American Oil Company and that he had stopped by petitioner's home on the evening of June 13, 1970. Carter said that he had dropped by earlier that day to speak with Jackson while on the way to make a delivery for his employer (T. 235). Carter testified that he returned to petitioner's house about 11:30 p. m. after making another delivery. Carter found Jackson in the

kitchen with his head on the table. Efforts to rouse petitioner proved fruitless, and Carter, after chatting with a Herlene Washington who was also in the kitchen, went upstairs (T. 236). There, Carter chatted with Robert Moses, a tenant in the house, who ascribed Jackson's condition to wine (T. 239). After drinking a glass of wine, Carter left the house to return the company's truck, returning to the house around 12:30 a. m. (T. 239).

Carter testified that after Herlene Washington let him back in, he saw petitioner, and then spent the rest of the evening with Moses in his room since petitioner was still *non compos mentis.* Carter finally left about 4:30 a. m. after seeing petitioner for one last time (T. 240, 243–4).

Robert Moses, the tenant, testified that he first saw Jackson about 10 p. m. on the evening of June 13 in the kitchen. At 11:30 p. m., he returned to the kitchen to find Carter, Washington and petitioner all present (T. 247–48). Moses testified that he came back to the kitchen about 1 a. m. and noticed Washington and the petitioner there. Petitioner was "still stretched out across the table." (T. 249).

Herlene Washington testified that she was baking a cake in the kitchen during the period in question—11:30 p. m. to 2:30 a. m. She testified that Jackson was "laying with his head down on the table" for the entire period (T. 262). Her testimony corroborated the various events testified to by Moses and Carter.

At the close of the petitioner's case, the People called one Joseph Gorr as a rebuttal witness. Gorr, who was George Carter's supervisor at the American Oil Company, gave testimony based on employee time records and punch cards which tended to contradict Carter's testimony regarding his whereabouts on the night in question. The documents were admitted into evidence, after several off-the-record conferences, over defense objection (T. 278).

---

3. I shall not speculate that a jury might have convicted upon the testimony of Mary Phifer alone: three of the four identification witnesses which the State tendered should not have been permitted to testify, and obviously the State regarded their testimony as important, or it would not have used them.

The records indicated that Carter left the terminal in the Inwood section of Nassau County at 1 p. m. (T. 279), made two deliveries and checked into Amoco's Grand Street terminal at 5:30 p. m. (T. 292). He left, made two more deliveries, and returned to Grand Street at 9:30 p. m. (T. 280–8). He then drove out to Astoria Boulevard in Queens, made one delivery, and returned to Grand Street three hours later at 12:30 a. m. (T. 298). He made one more stop that night, delivering 2800 gallons of gasoline to a Brooklyn address (T. 298–300). Finally he returned the truck to Inwood and signed out at 3:17 a. m. (T. 282).

Gorr agreed that the records were entirely of the individual driver's own making, and that the supervisor had no way of knowing whether the records accurately reflected the driver's movements and no way of knowing whether the driver made any stops beyond those listed on the records (T. 287, 293–95).

Petitioner's attorney did not indicate for the record whether he was surprised by the rebuttal witness or not. The two side-bar conferences that were held at the time that Mr. Gorr began his testimony were not recorded, nor did petitioner's attorney make known the basis of his objection to the time

records. Petitioner's attorney did request a five-minute recess during Gorr's cross-examination (T. 288) and another one following redirect examination (T. 301–302), both of which were granted.

(2) *Retroactivity of Wardius v. Oregon.*

■ N.Y.C.C.P. § 295–*l* (and its predecessor, N.Y.C.P.L. § 250.20) is unconstitutional in light of *Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973) (declaring a similar Oregon statute unconstitutional), and *People v. Bush,* 33 N.Y.2d 921, 352 N.Y.S.2d 936, 308 N.E.2d 451 (1973), *cert. denied,* 419 U.S. 848, 95 S.Ct. 85, 42 L.Ed.2d 77 (1974) (declaring the New York version unconstitutional). The significant question is whether *Wardius* is retrospectively applicable to trials, such as petitioner's, which took place prior to June 11, 1973, the date of the *Wardius* decision.[4]

In *Wardius,* the defendant had presented an alibi witness who testified that she and the defendant were at the movies when the alleged crime occurred. Her testimony was stricken by the court, and defendant was thereafter precluded from testifying to the alibi, because defendant had failed to comply with an Oregon statute requiring de-

---

4. Petitioner preliminarily suggests that the significant date is not the date of the *Wardius* decision, but rather June 22, 1970, the date of the decision in *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446. In *Williams,* the court considered the constitutionality of a Florida statute which imposed a duty on the defendant to disclose intended alibi witnesses and a reciprocal duty on the prosecution to disclose alibi rebuttal witnesses. The statute was challenged on the ground that it violated the Fifth and Fourteenth Amendment prohibitions against compelling criminal defendants to be witnesses against themselves. The Court upheld the statute, noting, in the course of its opinion, that the Florida statute was "carefully hedged with reciprocal duties requiring state disclosure to the defendant." *Id.* at 81, 90 S.Ct. at 1896.

Petitioner urges that the *Wardius* doctrine was in full bloom as of the date of *Williams*; that *Wardius* was a mere restatement of *Williams*; and that the question of retroactivity should therefore be reckoned from the date of *Williams,* which was decided prior to petitioner's trial. Petitioner relies on a footnote to the *Williams* decision which he characterizes as a

"specific warning to New York and other states with notice of alibi statutes." It reads as follows:

*We do not, of course, decide that each of these alibi-notice provisions is necessarily valid in all respects;* that conclusion must await a specific context and an inquiry, for example, into whether the defendant enjoys reciprocal discovery against the State. *Id.* at 82 n.11, 90 S.Ct. at 1896 (emphasis added). While the language in that footnote may be instructive on the question of whether the prosecution was entitled to rely on prior statutory standards in failing to supply defendant with notice of witnesses intended to rebut alibi testimony, *Michigan v. Payne,* 412 U.S. 47, 51, 93 S.Ct. 1966, 36 L.Ed.2d 736 (1972), the Court stopped short of announcing a new precedent. Indeed, considering the facts and issue presented to the *Williams* court, the language on the question of "reciprocal discovery" was dictum. While *Williams* may well have heralded *Wardius'* constitutional rule with respect to advance notice of alibi rebuttal witnesses, it did not constitute a binding constitutional interpretation.

fendants to give advance notice of intended alibi witnesses. The Supreme Court reversed the defendant's conviction. It declared that the statute was "fundamentally unfair," since it required "a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State." *Id.* at 476, 93 S.Ct. at 2213.

The Court rejected Oregon's argument that defendant should have allowed the state courts to rule on the statute by giving notice of his alibi witness and then requesting reciprocal discovery of rebuttal witnesses. Holding that the defendant could not "be faulted for taking the [Oregon] legislature at its word," *id.* at 478, 93 S.Ct. at 2214, the Court stated that defendant could not be required to disclose his alibi witnesses on the hope that the state court, in derogation of the statute, would grant him reciprocal disclosure of prosecution rebuttal witnesses. *Id.* at 477–78, 93 S.Ct. 2208. The state "cannot constitutionally force compliance with its scheme on the basis of a totally unsubstantiated possibility that the statute might be read in a manner contrary to its plain language." *Id.* at 479, 93 S.Ct. at 2214.

The Court has given no indication whether its ruling should be applied retroactively.

In deciding this question, it will be helpful to review some of the lower court cases in which the issue of retroactivity with respect to *Wardius* has already been confronted.

In *Mayer v. Moeykens,* 373 F.Supp. 649 (D.Vt.1973) (Waterman, C. J., sitting by designation), *aff'd* 494 F.2d 855 (2d Cir. 1974), *cert. denied,* 417 U.S. 926, 94 S.Ct. 2633, 41 L.Ed.2d 229 (1975), petitioner, convicted after a trial held prior to *Wardius,* claimed that a Vermont statute was unconstitutional in light of *Wardius.* The statute obligated a defendant who contemplated making use of an alibi defense to give the prosecution written notice stating where he claimed to have been at the time the crime took place. Noting that the statute did not require the defendant to provide a list of alibi witnesses, Judge Waterman found that the petitioner was unable "to show material prejudice to him" resulting from the application of the statute. He held that, whether or not the Vermont alibi statute was constitutionally valid after *Wardius, Wardius* should not be applied retroactively to those facts. The Second Circuit affirmed, noting that petitioner's counsel had conceded the *Wardius* argument to be meritless. 494 F.2d at 859.

An Illinois notice of alibi statute was challenged in *United States ex rel. Hairston v. Warden,* 407 F.Supp. 524 (N.D.Ill.), *rev'd,* 539 F.2d 713 (7th Cir. 1976). In *Hairston,* the attorney for petitioner provided the habeas court with an affidavit explaining that, prior to the state trial which resulted in petitioner's conviction, he had weighed the possibility of presenting an alibi defense and had made a pre-trial motion seeking an order declaring Illinois' non-reciprocal notice-of-alibi statute unconstitutional or alternatively directing the prosecution to turn over a list of rebuttal witnesses, grand jury minutes, police reports and statements of witnesses. The motion, decided before *Wardius,* was denied, and petitioner's attorney elected to forego the alibi defense rather than to risk the uncertainties built into the non-reciprocal statute. The petitioner was convicted. The habeas court found that the statute "placed a constitutionally impermissible obstacle in the path of the fact-finding process at trial," *id.* at 528. It applied *Wardius* retroactively, asserting that the thrust of *Wardius* was to eliminate "an aspect of the criminal trial that substantially impairs its truth finding function and so raises questions about the accuracy of guilty verdicts in past trials." *Id.* at 529, *quoting Williams v. United States,* 401 U.S. 646, 653, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971).

The Seventh Circuit reversed in an unpublished opinion. It characterized *Wardius* as being concerned primarily with the exclusion of relevant evidence by means of a procedure which "unfairly weighted the trial process in favor of the prosecution." (slip op. at 2). In the Seventh Circuit's

view, the aggrieved party must show that the evidence was improperly excluded by the court and that the exclusion tainted the fact-finding process. *Id.* Since the petitioner in *Hairston* did not move for a pre-trial ruling allowing him to present his alibi at trial without first complying with the statute, the court concluded that he was not prejudiced by the application of the statute. The court apparently concluded that petitioner's pre-trial request for a list of rebuttal witnesses, which was denied, did not implicate the statute.

New York's statute has been the subject of considerable litigation, much of it concerning one Leon Bush. Bush, at his 1971 murder trial, had given notice of his intended alibi witnesses after losing a motion to have C.C.P. § 295–*l* declared unconstitutional. He then moved for an order directing the prosecution to reveal the identities of its rebuttal witnesses. The motion was denied, Bush put in his alibi defense, and the state called three surprise rebuttal witnesses. Bush was convicted. On appeal, the New York Court of Appeals held the statute unconstitutional, *Wardius* having been decided during the pendency of the appeal, but denied Bush relief by declining to apply *Wardius* retroactively. *People v. Bush,* 33 N.Y.2d 921, 352 N.Y.S.2d 936, 308 N.E.2d 451 (1973), *cert. denied,* 419 U.S. 848, 95 S.Ct. 85, 42 L.Ed.2d 77 (1974). In reasoning somewhat similar to that of the *Hairston* court, the Court of Appeals noted that in *Bush,* unlike *Wardius,* the defective statute did not work an exclusion of testimony, but "operated only to deny defendant of advance notice of the identity of these rebuttal witnesses, and to this extent to hinder his preparation to impeach, discredit or rebut their testimony." *Id.* at 923, 352 N.Y. S.2d at 937, 308 N.E.2d at 451. Only where the application of the statute resulted in exclusion of evidence would the court apply *Wardius* retroactively, as it did in *People v. Morales,* 37 N.Y.2d 262, 372 N.Y.S.2d 25, 333 N.E.2d 339 (1975).

Bush next petitioned for a federal writ of habeas corpus. In *Bush v. Fogg,* No. 76 C. 1676 (E.D.N.Y. May 23, 1977), *remanded,* No. 77–2137 (2d Cir. March 2, 1978), Bush contended that *Wardius* should be applied retroactively to cover cases such as his where the notice provision made proper preparation impossible. In denying the writ, the habeas court pointed out that at trial, defense counsel had not moved for a recess or a continuance to prepare a cross-examination and that Bush made no "allegation of specific prejudice incurred by petitioner as a result of the State's refusal to disclose the identity of these witnesses prior to their testimony." (slip op. at 20).

In remanding for further consideration of the *Wardius* point, the Second Circuit, in its order, held that petitioner ought be allowed to allege prejudice:

> The district court in its discretion may allow evidence to supplement the record of the State court proceedings and should consider and rule upon whether (1) there was actual prejudice to [Bush], as claimed and (2) if so, whether such prejudice is constitutionally significant.

Slip op. at 2. The case is now pending before the district court.

■ The Second Circuit's apparent position—that petitioners must at least demonstrate constitutionally significant prejudice in order to have *Wardius* apply retroactively—was foreshadowed in this district in *United States ex rel. McCrory v. LaVallee,* 75 Civ. 6104 (S.D.N.Y.1977), and in *Green v. Fogg,* 422 F.Supp. 1034 (S.D.N.Y.1976). In both cases the petitioner had failed to request an adjournment after the introduction of the rebuttal testimony. In *Green,* the court found that since the rebuttal evidence consisted solely of expert testimony contradicting the alibi witnesses' recollection of what the weather was like at the time in question, "the error if there was any at all, was not prejudicial."

The gist of these cases, and of the Second Circuit's remand in *Bush,* is that petitioners seeking retroactive application of *Wardius* must allege and prove that the application of the defective statute prejudiced the defendant's case to a constitutionally significant degree. *McCrory* and *Green* suggest the caveat that the petitioners must have taken appropriate steps to alleviate any prejudice by requesting some measure of

relief from the trial court, usually an adjournment or continuance.

It would appear that the Supreme Court case law on the issue of retroactivity does not preclude retroactive application of the *Wardius* rule. It has been clear since *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), that in certain instances new judge-made rules in the criminal procedure area should be applied prospectively only. The *Linkletter* Court, in deciding that *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), should not be applied retroactively, reasoned that it made no sense to give retroactive force to a new rule whose sole purpose was to improve police conduct. Where, in Mr. Justice Clark's words, "the fairness of the trial is not under attack," *id.* 381 U.S. at 639, 85 S.Ct. at 1743, the Court saw no point in disrupting the administration of justice in the state courts by requiring hearings to pass on evidence "long since destroyed, misplaced or deteriorated," *id.* at 637, 85 S.Ct. at 1742, and to take the testimony of witnesses whose memories on ancient matters would not be reliable. *Id.*[5] These concerns have been reiterated in the more recent retroactivity cases. Thus, in *Michigan v. Payne,* 412 U.S. 47, 93 S.Ct. 1966, 36 L.Ed.2d 736 (1973), the Court held:

> The test utilized repeatedly by this Court to ascertain whether "new" constitutional protections in the area of criminal procedure are to be applied retroactively calls for consideration of three criteria: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards".

*Id.* at 51, 93 S.Ct. at 1669, *quoting Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). I shall consider these factors *seriatim.*

(a) *The purpose of the new standard.*

It is plain from the language of the *Wardius* opinion that the Court was primarily concerned with the one-sidedness of the discovery procedure. The Court praised the State's efforts to expand discovery so as to help attorneys prepare their cases "and thereby reduce the possibility of surprise at trial." *Wardius, supra,* 412 U.S. at 473, 93 S.Ct. at 2211. The defect in the statute, according to the Court, was that unlike the Florida statute construed in *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (*see* footnote 4 hereto), the Oregon statute demanded that defendants make full disclosure of their witnesses "while maintaining 'poker game' secrecy for [prosecution] witnesses." *Id.* 412 U.S. at 475, 93 S.Ct. at 2212. The focus of the Court's concern was not so much the wrongful exclusion of evidence that resulted as the "fundamentally unfair" situation that the defendant found himself in before the trial even began. *Id.* at 476, 93 S.Ct. 2208. I conclude, therefore, that the purpose of the *Wardius* rule was to eliminate the lack of preparation and consequent surprise that resulted from one-way discovery. This is the gravamen of petitioner's claim.

(b) *The extent of reliance on the old standard.*

Significantly, respondent does not argue that New York law enforcement officials did in fact rely on the pre-*Wardius* standard, but rather argues that the reliance (if any) was justifiable. I find that the matter has been settled by the New York Court of Appeals, and that there has been no extensive reliance by New York law enforcement authorities upon the pre-*Wardius* standard. In *People v. Morales,* 37 N.Y.2d 262, 372 N.Y.S.2d 25, 333 N.E.2d 339 (1975), Judge Fuchsberg, for a unanimous court, stated that "there appears to have been no significant degree of reliance on our notice-of-alibi statute by law enforcement authorities in general, or prosecutorial authorities in particular, so as to adversely affect the administration of justice through retroactive application of the *Wardius* rule." *Id.* at 270, 372 N.Y.S.2d at 32, 333 N.E.2d at 344.

---

**5.** *See* Broderick, *The Supreme Court and the Police: A Police Viewpoint,* 57 J.Crim.L., Criminology & Pol.Sci. 271, 272–73 (1966).

(c) *The possible effect on the administration of justice.*

The *Morales* court, in considering this very question, noted that neither party, in that case, had "directed our attention to even a single other reported or pending case involving excluded alibi testimony under the old statute." *Id.* To this date, the only cases similar to petitioner's in New York that the parties at bar have cited to me are *Bush, McCrory,* and *Green.* Indeed, although *Wardius* has been in effect for five years, the litigation on this issue has been sparse. In my judgment the "substantial interference with the administration of justice" predicted by respondent will not come to pass.

My findings (1) that there was little reliance, and (2) that the administration of justice will not be disrupted by retroactive application, make unnecessary a determination whether the *Wardius* rule was designed to overcome a substantial impairment of the truth finding function of criminal trial so as to override all claims of reliance and disruption. *See Hankerson v. North Carolina,* 432 U.S. 233, 97 S.Ct. 2339, 2343, 53 L.Ed.2d 306 (1977) (No. 75–6568); *Ivan V. v. City of New York,* 407 U.S. 203, 204–05, 92 S.Ct. 1951, 32 L.Ed.2d 659 (1972); *Williams v. United States,* 401 U.S. 646, 653, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971).

There being no bar to retroactive application, the question remains whether petitioner has shown the necessary degree of prejudice.

■ The parties differ as to the existence and degree of prejudice. Respondent insists that Gorr's rebuttal testimony could not have surprised the defense since Mr. Kellam should have anticipated a rebuttal based on the work records. It also points out that the record shows that Mr. Kellam did not request anything more than brief recesses, that the court granted these requests, and that no objection was made on the record to Gorr's testifying. Respondent further argues that the rebuttal testimony was restricted to the credibility of the alibi witnesses and therefore did not "substantially impair [the] truth-finding function" of petitioner's trial, within the meaning of *Williams v. United States,* 401 U.S. 646, 653, 91 S.Ct. 1148, 1152, 28 L.Ed.2d 388 (1971).

Petitioner, on the other hand, takes the position that Mr. Kellam was caught completely by surprise as a result of the statute. He argues, in effect, that the production of Gorr and the introduction of the time cards without advance warning threw the defense into disarray, destroyed the credibility of the alibi witnesses, and created a false impression in the minds of the jurors that the petitioner had attempted unsuccessfully to orchestrate a fabrication. He further argues that, aside from the damage caused at trial, his case was prejudiced by the statute at the outset in that it compelled him to choose between putting in an alibi defense (with the concomitant risk of destructive surprise) and foregoing the alibi evidence entirely, and points out that this is the form of prejudice with which *Wardius* was primarily concerned.

I am satisfied that, procedural considerations aside,[6] petitioner sustained material

---

**6.** Petitioner prior to trial moved for a bill of particulars and requested that a list of all prosecution witnesses be included. The trial court denied the request. Respondent insists that a motion for a bill of particulars is an inappropriate method of requesting lists of witnesses.

The record indicates that at trial, the defense counsel, Mr. Leroy Kellam, made an objection to the introduction of the time cards (which respondent's rebuttal witness identified) after two off-the-record side bar conferences. No formal objection was ever made on the record to Gorr's testimony. At the close of the direct examination, Mr. Kellam began cross-examining the rebuttal witness without requesting an adjournment or a continuance. After a while, Mr. Kellam requested and received a short recess (T. 287–88) and then continued his questioning. After the cross-examination and a brief redirect examination had been completed, Mr. Kellam requested another recess. The court replied, "We are going to sit right here and do what you want" (T. 301). Mr. Kellam then left the court room for a brief period while the judge, prosecutor, defendant, and jury sat waiting (T. 302). Mr. Kellam had no further questions upon his return.

substantive prejudice of constitutional dimensions from the requirements of the alibi statute. The state's surprise rebuttal evidence effectively destroyed the credibility not only of the truck driver Carter, at which it was directed, but also of the other alibi witnesses, Washington and Moses. If defense counsel had known that the rebuttal evidence would be offered, he could have dealt with it in his examination of Carter, or he could have proceeded with two instead of three alibi witnesses, eliminating Carter.

I find that *Wardius* applies to the trial of petitioner. On this ground also, therefore, the writ is granted.

V.

*The Requested Lineup*

I think it worthwhile to set forth my findings on petitioner's other claim so as to avoid an otherwise unnecessary remand in the event of an appeal and reversal on this issue.

Prior to petitioner's arrest, the police had listed only John Walker and Veryl Walker as suspects. After petitioner's indictment and prior to trial, petitioner's attorney suggested investigation of another possible suspect. Acting on a tip to the effect that one Anthony Carolina was the Harvey's Lounge gunman, Leroy Kellam, petitioner's attorney, visited Carolina on February 2, 1971 at the Queens House of Detention. (In an affidavit submitted to this court, Kellam stated that Carolina resembles petitioner.) Kellam then filed a motion asking that a new line-up be held involving Carolina and that the entire matter be resubmitted to the grand jury. Justice Frank D. O'Connor of the Queens Supreme Court denied the motion without hearing opposition argument.

Mr. Kellam also wrote to the Queens District Attorney requesting an investigation of Carolina and a new line-up. The district attorney denied this request.

Petitioner argues that the State trial court's refusal to order the lineup requested by petitioner amounted to a denial of due process under the Fourteenth Amendment. Petitioner reasons that the prosecution occupies a much stronger position than the accused, *Application of Kapatos*, 208 F.Supp. 883, 888 (S.D.N.Y.1962), that the prosecution is under a duty to disclose relevant evidence under many circumstances, *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the prosecution has, upon occasion, been ordered to cooperate with the accused in obtaining important potential witnesses, *United States v. D'Angiolillo*, 340 F.2d 453 (2d Cir. 1965). Petitioner also relies on *Evans v. Superior Court*, 11 Cal.3d 617, 114 Cal.Rptr. 121, 522 P.2d 681 (1974), and *State v. Boettcher*, 338 So.2d 1356 (La.1976), which held that in certain instances, a criminal defendant has the right under the Due Process Clause to request and receive a pre-trial lineup. The circumstances of this case, it is urged, indicate that a lineup should have taken place.

I agree with respondent that this case is controlled by the Second Circuit's determination in *United States v. Ravich*, 421 F.2d 1196, 2d Cir., *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970), which, it should be pointed out, was a federal prosecution for bank robbery. In *Ravich*, the defendant's picture was picked out by several witnesses from a photographic array. The defendant then requested that he be subjected to a lineup before the same witnesses, a request which the trial court denied. In holding that "[a] pretrial request by a defendant for a lineup is . . . addressed to the sound discretion of the district court and should be carefully considered," *Id.* at 1203, the Second Circuit made it plain that the denial of the lineup request had no constitutional implications.

While appellants speak in terms of denial of a constitutional right, they have not elaborated on what the right is. Clearly, there is no violation of the confrontation

clause of the Sixth Amendment; defendants not merely were given full opportunity to cross-examine the witnesses at trial but had the benefit of pretrial proceedings in doing so. . . . We would likewise not be disposed to hold a line-up to be so essential to the presentation of a proper defense concerning identification that refusal to arrange one on a defendant's request is a denial of due process of law.

*Id. Ravich* was cited with approval in *United States v. Estremera,* 531 F.2d 1103 (2d Cir.), *cert. denied,* 425 U.S. 979, 96 S.Ct. 2184, 48 L.Ed.2d 804 (1976), where the court flatly held that "[i]t is now established that a defendant has no constitutional right to a line-up." *Id.* at 1111. *See also United States v. Boston,* 508 F.2d 1171 (2d Cir. 1974), *cert. denied,* 421 U.S. 1101, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975).

The fact that this case involves a request that a person other than the accused be subjected to a lineup has no little significance. A request made by an individual, accused of a crime but presumed innocent, to subject *himself* to a lineup should perhaps not be cavalierly denied. Where, however, as here, the request is that *another individual* be compelled to stand in a lineup, a far more delicate situation is presented, since the court must take into account the rights of the unrepresented individual sought to be exposed to the lineup. Although a lineup involving Anthony Carolina might well have been a proper and productive tool in the quest for truth, I find no due process violation in the denial.

## VI.

If the indictment is not moved for retrial within 60 days of the date of this memorandum order, petitioner shall be released from all further custody with respect to the charges contained in the indictment.

SO ORDERED.