Edmond JACKSON, Petitioner-Appellee,

v.

Walter FOGG, Superintendent, Green Haven Correctional Facility, Respondent-Appellant.

No. 421, Docket 78–2107.

United States Court of Appeals, Second Circuit.

Argued Nov. 17, 1978.

Decided Dec. 19, 1978.

Thomas S. O'Connor, Deputy Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. of State of N. Y., New York City, on the brief; Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for respondent-appellant.

Helen Bodian, New York City (Prisoner's Legal Services of New York), for petitioner-appellee.

Before LUMBARD, FRIENDLY and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

Edmond Jackson's petition for habeas corpus to set aside his conviction for murder in Queens County presents the rare case of a record almost entirely bare of credible untainted evidence of guilt. At the same

time, the state's appeal reminds us of the great care we must exercise before setting aside a conviction for so serious an offense, particularly when it has been unanimously affirmed by the New York Appellate Division and Court of Appeals.

After consideration of Jackson's petition and examination of the records of the trial and his appeals to the New York courts, Judge Broderick, in the Southern District, granted the petition in a decision and order, dated August 25, 1978. We agree with his finding that the identification testimony of three of the four eyewitnesses presented by the State at trial was so tainted by suggestive procedures of the police that its admission into evidence against Jackson constituted a denial of due process.

At 1:30 A.M. on Sunday, June 14, 1970, an armed man entered Harvey's Lounge in Jamaica and announced, "This is a stickup." The gunman's words threw the lounge into an uproar as the 40 to 60 customers scrambled for cover. After a brief interval, the gunman stepped forward and fired one shot, mortally wounding Harold Dixon who was tending bar.

The police investigation of the shooting was conducted by Detectives Cash and Cannon of the New York Police Department. They were unable to locate any tangible evidence as to the identity of the gunman and consequently focused their attention on four persons who came forward as eyewitnesses: Mary Phifer, Edward Byrd, Willie Johnson and Joseph Webb.

According to the four eyewitnesses' subsequent testimony, none of them had ever seen the gunman before the night of the shooting and on that occasion they observed him only for the few seconds it took them to turn away and scramble for cover. Webb was tending bar when he heard the commotion, looked toward the door and saw a man holding a gun in his left hand. As the man moved toward the bar and fired a shot, Webb immediately dropped to the floor and crawled to the back of the room. He stated that he did not see the gunman after the shot was fired and that he had observed him for a total of "maybe two, three seconds or minute—might have been a minute."

Byrd, Johnson and Phifer were sitting at the front end of the bar talking to each other. Byrd and Phifer were seated with their backs to the door, only four or five feet away. Byrd and Phifer first noticed the gunman when he said, "This is a stickup." Johnson pushed Phifer off her bar stool and all three of them ran to the back of the bar after which they heard the shot.

In the days following the shooting the four eyewitnesses were shown a large number of mugshots, and, on June 18th, Phifer stated that photographs of a John Walker and a Veryl Walker "strongly resembled" the gunman. The three other witnesses confirmed the resemblance. Although John Walker was in prison at the time of the shooting, the tentative identification of Veryl Walker offered an apparently promising lead, since Detectives Cash and Cannon had previously been told by an informer that Veryl Walker was the Harvey's Lounge gunman. But, despite this seeming break in the case, the detectives made only sporadic attempts to find Veryl Walker [1] and ended their search for him altogether on July 13th, the day Edmond Jackson was brought into the investigation.

How the detectives' investigation came to focus on Jackson remains unclear. Cannon testified at the pre-trial *Wade* [2] hearing, which was held the day before the trial in March of 1971 to determine the propriety of the identification process, that Jackson was taken to the stationhouse on July 13th for reasons having nothing to do with the Dixon shooting. He indicated that Jackson became a suspect only when Webb, who also "happened" to be at the stationhouse, saw

1. The informer had also supplied the detectives with Veryl Walker's alleged address. The detectives made one trip to that address but did not locate Walker. Detective Cannon testified at trial that he had also checked with the Post Office, "telephone records," and people in the street in an effort to locate Walker, but conceded that the search ended when Edmond Jackson was taken into custody.

2. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

Jackson and told the detectives that he was the man who shot Dixon. Cash's account differs; he testified at the hearing that Jackson was already under investigation when he was taken to the stationhouse and that Webb had been notified to "stand-by" in case he was needed to make an identification. Though Cannon's subsequent testimony at trial tended to follow Cash's version of the facts,[3] neither detective explained nor does the record otherwise reveal what information led the police to suspect Jackson of the crime.

What is clear from the record is that all four eyewitnesses came to the stationhouse on July 13th and identified Jackson in two separate line-ups of the same six black men. The reliability of those identifications was, of course, the focus of the state court *Wade* hearing, and the eyewitnesses' testimony as to the circumstances surrounding their identifications of Jackson is illuminating. Byrd stated that he had stopped at Harvey's Lounge on his way home from work. Cash and Cannon picked him up there and drove him to the stationhouse. On the way, Cash told Byrd that "he found the fellow who shot Harold Dixon." While in the detectives' office Byrd, after spotting Jackson through a two-way glass sitting by himself in a back room, identified Jackson as the gunman.

Webb explained that he was called by a police officer who asked him to come to the stationhouse "to see if I could pick out the individual who did the shooting." Cash met him at the desk and as they were walking to the detective room Webb saw Jackson and one other person sitting together some 15 to 20 feet away. At that point he told Cash that Jackson was "the fellow that shot Harold."

According to Johnson's *Wade* testimony, he came to the stationhouse in response to a message left at his home that the police "had somebody down there that they wanted me to look at in a line-up." While Johnson was in a waiting room near the detectives' office he noticed Jackson in an adjoining room. A little later, Cash and Jackson walked past Johnson as he sat in the waiting room.

Mary Phifer, who had arrived at the stationhouse after the others, was the only witness who denied seeing Jackson prior to the two line-ups.

Presented with the testimony outlined above, the trial judge stated at the conclusion of the *Wade* hearing that the procedure at the stationhouse raised a "very, very serious question" and was "highly unusual." He ruled, however, that Byrd, Webb and Johnson would be permitted to testify at trial, noting only that the stationhouse procedure would not "so contaminate" in-court identification.

Jackson's trial commenced one day after the *Wade* hearing ended. Each of the four eyewitnesses testified as to the incident at Harvey's Lounge and each of them identified Jackson as the man who shot Harold Dixon.[4] The state presented no other evidence linking Jackson to the crime.[5] After some four hours of deliberation, the jury found Jackson guilty. His conviction was unanimously affirmed, without opinion, by the Appellate Division. 40 A.D.2d 1081, 337

3. For reasons unclear from the record, Detective Cash did not testify at Jackson's trial.

4. Over defense objections, Phifer was permitted to testify regarding her stationhouse identification of Jackson. At the same time, the court ruled that it would not allow the State to bring out the stationhouse identification by the other three witnesses since they had seen the defendant at the stationhouse prior to the line-up. Fearing that discussion of their prior identifications would bolster the in-court testimony of Byrd, Webb and Johnson, Jackson's counsel decided, understandably enough, not to go into this matter on his own.

5. Jackson did not testify in his own behalf but based his defense on the testimony of three alibi witnesses. Notice of their testimony was given to the State some days prior to its use as required by New York Code of Criminal Procedure § 295–*l*. In rebuttal the State produced testimony and evidence as to which no notice was either required or given.

The absence of reciprocity in N.Y.C.C.P. § 295–*l* was held to render the statute unconstitutional in *People v. Bush,* 33 N.Y.2d 921, 352 N.Y.S.2d 936, 308 N.E.2d 451 (1973), *cert. denied,* 419 U.S. 848, 95 S.Ct. 85, 42 L.Ed.2d 77 (1974), a decision that followed the Supreme Court's ruling in *Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), that a

N.Y.S.2d 1005 (2d Dept.1972). The Court of Appeals also affirmed unanimously, also without opinion. 35 N.Y.2d 856, 363 N.Y.S.2d 580, 322 N.E.2d 272 (1974).

Judge Broderick conducted his review of the record in accordance with the two-step process suggested in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1973), which requires a determination of whether the identification process was impermissibly suggestive and, if so, whether it was so suggestive as to raise "a very substantial likelihood of irreparable misidentification." *Id.* at 198, 93 S.Ct. at 381, citing *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), see *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). With regard to the first part of that test, Judge Broderick concluded that the stationhouse procedures were suggestive, noting that the police arranged to have the eyewitnesses on hand when Jackson was brought in and that three of the eyewitnesses had a pre-lineup opportunity to see Jackson. While acknowledging that the pre-lineup confrontation in this case may simply have been the result of police negligence, the district judge correctly observed that the Supreme Court has found "show-up" procedures to be suggestive. *E. g., Neil v. Biggers, supra.* Previous decisions of this Circuit also support his conclusion. *E. g., United States ex rel. Lucas v. Regan,* 503 F.2d 1 (2d Cir. 1974).

Addressing the second part of the test, Judge Broderick, consistent again with the teaching of *Neil v. Biggers, supra,* measured the reliability of the in-court identifications against the "totality of circumstances," with specific reference to "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree

of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation," *Id.* 409 U.S. at 199–200, 93 S.Ct. at 382. He found:

(1) that the witnesses did not have a good opportunity to view the gunman;

(2) that they had little motivation to study the gunman's face and every reason to turn and run;

(3) that there was no evidence of how the witnesses initially described the gunman (and therefore no basis for comparison);

(4) that the witnesses appeared to have displayed varying degrees of certainty at the stationhouse; and

(5) that a considerable amount of time (one month) had elapsed between the crime and the confrontation.

The record fully supports these findings, and clearly warrants Judge Broderick's conclusion that the likelihood of misidentification by Byrd, Webb and Johnson was sufficiently great to make the use of their trial identifications of Jackson a denial of due process.

We must also reject the State's contention that the trial court's ruling at the *Wade* hearing is entitled to presumptive weight under 28 U.S.C. § 2254(d). The state trial judge made no detailed findings either as to suggestiveness or as to reliability and evidenced a basic lack of familiarity with the appropriate legal standards. Under all the circumstances disclosed by the record and in light of the unsupported conclusions of the state trial judge, the district court quite properly made its own assessment of the undisputed facts and correctly applied the governing principles. *See Unit-*

similar Oregon statute was unconstitutional. The Court in *Wardius* gave no indication as to whether its decision was to be applied retroactively, and the New York Court of Appeals declined to apply *Bush* to cases the trial of which began before the decision in *Wardius,* except where application of the notice of alibi statute resulted in the exclusion of alibi evidence.

Judge Broderick found, however, that Jackson was materially prejudiced by the failure of

New York law to require that the State give notice of its rebuttal evidence, and cited that conclusion as an alternative ground for the grant of habeas relief. In view of our holding that the conviction cannot stand because the State's case was so tainted by the identification procedures and the testimony resulting therefrom, we need not deal with the interesting questions of prejudice and retroactivity that Judge Broderick's holding presents.

**112**

ed States ex rel. Williams v. La Vallee, 487 F.2d 1006 (2d Cir. 1973), cert. denied, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974).

Centuries of experience in the administration of criminal justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness is highly suspect. Of all the various kinds of evidence it is the least reliable, especially where unsupported by corroborating evidence.

As Glanville Williams has noted in *The Proof of Guilt*, (3d ed. 1963),

"In England and America most of the spectacular miscarriages have been due to wrong identification of the defendant as a culprit." *Id.* at 106.

*See also,* Borchard, *Convicting the Innocent: Errors of Criminal Justice* (3d ed. 1970); B. Frank & J. Frank, *Not Guilty,* (1957). The dangers of convicting on identification testimony alone are well known to those whose duty it is to prosecute crime. Yet here the prosecutor and the police were content to consider the case solved in reliance on questionable identification procedures and despite the fact that positive information regarding other suspects had been called to their attention.[6]

It is difficult to understand why the District Attorney of Queens County would have proceeded with the trial of the charges against Jackson on such highly dubious evidence and in light of the incomplete and negligent investigation conducted by the detectives. Neither the press of business nor the urgency to solve so serious a crime as that committed by the gunman can justify the negligent use of unreliable procedures in place of thorough and careful investigation.

We affirm the judgment of the district court and direct that our mandate issue forthwith. We leave it to the district court to pass on the petitioner's application to be released from custody in light of what the State has indicated to be a very remote possibility of retrial.

---

**6.** Veryl Walker was not the only alternative suspect that the police were aware of. In early February 1971, petitioner's assigned counsel, Leroy Kellam, brought to the attention of the District Attorney information he had received that the shooting had been committed by one Anthony Carolina, then being held for another attempted holdup of a Queens bar. Kellam pointed out that Carolina, whom he had visited in jail, closely resembled Jackson and he asked that a new line-up including Carolina be conducted. He also moved in the Supreme Court

for an order requiring such a line-up. The court denied the motion and the District Attorney refused to do as requested. Carolina was later convicted for attempted murder, and, after his conviction was reversed, he pleaded guilty to attempted robbery for which he is presently serving a 15 year sentence of imprisonment.

The above is set forth in affidavits attached to Jackson's petition and is not denied by the State.