Kenneth SOLOMON, Petitioner,

v.

Harold SMITH, Superintendent, Attica Correctional Facility, Respondent.

No. 79 Civ. 979 (VLB).

United States District Court,
S. D. New York.

April 3, 1980.

William E. Hellerstein, New York City, for petitioner The Legal Aid Society; Todd Stern, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, Andrea G. Iason, Deputy Asst. Atty. Gen., New York City, for respondent.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I.

On October 7, 1974, three black males, one with a hood and a gun whom the others called "Kenny," entered the Bronx office of Dr. Jean-Louis Casseus, robbed the doctor, and robbed, raped, and sodomized the doctor's receptionist, Nancy Padovani. Ten days later, petitioner Kenneth Solomon was arrested and charged with the crime. Eight months later, petitioner Kenneth Solomon was convicted on one count each of first degree rape and first degree sodomy, and on two counts of first degree robbery, in a state jury trial. Petitioner exhausted his appeals in the state courts,[1] and is currently serving four concurrent sentences of five to fifteen years. He is here on petition for a writ of habeas corpus under 28 U.S.C. § 2254.

### II.

At his trial, petitioner was identified by Mrs. Padovani and Dr. Casseus as the gunman. There was no other evidence linking petitioner to the crime. Petitioner claims that the trial testimony of both Mrs. Padovani and Dr. Casseus was tainted by improper pre-trial identification procedures.

---

1. The Appellate Division affirmed the conviction without opinion and the New York State Court of Appeals denied leave to appeal.

I agree. I find that in the circumstances of this case there was, because of those improper pre-trial identification procedures, "a very substantial likelihood of irreparable misidentification" (*Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)), that petitioner was denied due process, and that a conviction predicated upon such tainted testimony must be set aside. *Jackson v. Fogg*, 589 F.2d 108 (2d Cir. 1978).

I have considered, in determining to grant the application for a writ of habeas corpus, that the suggestiveness of the prior identifications and confrontations at issue could have been explored on cross-examination at trial, and the reliability of the in-court identification left to the jury. As a practical matter such an option is not normally open to defense counsel in a criminal trial, and was not open to defense counsel in this trial. Its exercise would parade before the jury evidence of other identifications nearer in time to the crime, thus strengthening rather than weakening in the jurors' minds the impact of the in-court identifications.

Jurors sit on individual cases, and they apply their common sense to the resolution of the issues presented in those individual cases. They are not familiar with, and cannot be expected to be sophisticated with respect to, the propriety of investigative procedures. Where guilt of a heinous crime can be established solely by identification testimony—and the crimes charged against petitioner were heinous crimes—the jurors' determination will rest entirely on the credibility of the eyewitnesses.

In the case at bar Mrs. Padovani, the key State identification witness, undoubtedly believed that her identification of petitioner as the criminal was accurate. She could not be expected to understand the subtle impact which investigative suggestiveness might play in translating a tentative identification into a positive one. Nor could she be expected to understand the psychological process by which an extended uncounseled showup on the heels of investigative suggestiveness could substitute the image of the petitioner for that of the gunman. Her testimony undoubtedly impressed the jury as being honest and believable, and one would expect a jury hearing that testimony to return a verdict of guilty.

For these reasons it is for the court and not the jury to determine, within constitutional parameters, which identification procedures are suggestive, which are not; which suggestive identification procedures, considering the totality of the circumstances, so risk misidentification that they are unfair, and which do not; which uncounseled showups have been established, by clear and convincing evidence, not to have tainted later in-court identifications, and which have not. These determinations should be made by the trial court. Where they have not been made or where they have been made inadequately by the trial court they must be made elsewhere—on appeal, or, as here, on habeas review.

I grant the petition for a writ of habeas corpus on two grounds: a) the reception of the identification testimony of Mrs. Padovani; and b) the reception of the identification testimony of Dr. Casseus. If the indictment is not moved for retrial within 60 days of the date of this memorandum order, petitioner shall be released from all further custody with respect to the charges contained in the indictment.

### III.

#### A. *The Identification by Mrs. Padovani.*

##### 1. *Photographic Identifications*

On October 8, 1974, the day after the crime, Detective Lawrence Doherty of the Bronx Sex Crime Squad, who was in charge of the investigation, showed Mrs. Padovani an extensive photographic display containing over 200 pictures. Padovani selected five mugshots, among them petitioner's. (W. 55).[2] Petitioner's name, "Kenneth Solomon," was on the back of the photograph

---

2. Numbers prefaced by "W" refer to the record of the *Wade* hearing. Numbers prefaced by

"T" refer to pages of the trial. The first page of the trial record is T. 144.

of petitioner. (W. 31). Detective Doherty "read the back of" the photograph of petitioner. (W. 11). Mrs. Padovani requested and received a duplicate of the photograph on which she sketched, in ink, a hood around petitioner's face. (W. 11). She claimed at the *Wade* hearing that this process sharpened her memory of petitioner:

> Ans. . . . I drew the hood the way I see it.
>
> \*    \*    \*    \*    \*    \*
>
> . . . and then I was positively sure. (W. 73).

Nevertheless, Detective Doherty recorded her identification of Solomon as "possible." (W. 39).

Mrs. Padovani was periodically allowed to see a photograph of the petitioner, so his appearance became very familiar to her. Thus on October 17, 1974, Mrs. Padovani was told that petitioner had been arrested. She was summoned to the precinct station house, where she saw petitioner's picture on the bulletin board. (W. 75). She probably viewed petitioner's photograph again the next day at the courthouse, when she met Detective Doherty prior to petitioner's arraignment. (W. 28, 77). Doherty showed her petitioner's picture again after arraignment but before the case was presented to the grand jury (W. 14–16), and at least once more after petitioner was indicted. (W. 34).

### 2. *The Arraignment Showup*

Petitioner was arraigned in Bronx Criminal Court on October 18, 1974. He was not represented by counsel.

Present throughout the arraignment, which lasted 20 to 30 minutes (T. 183), were petitioner, Detective Doherty, Mrs. Padovani, and the assistant district attorney. The judge considered holding petitioner's case for night court, but proceeded with the arraignment when Doherty protested. (W. 28). Petitioner was identified by Mrs. Padovani. (W. 76).

### 3. *The January Lineups*

The victims had described the gunman among the three persons committing the October 7, 1974 crimes as 21, 5'7", 145 pounds (wearing a blue hooded parka with the hood up, work shoes, and blue dungarees). (W. 32).

At a lineup on November 19, 1974, Mrs. Padovani identified one Clayton Smalls as looking like one of the participants in the crime (T. 190–192; W. 42).

A series of three lineups was held on January 16, 1975. (W. 80). The second of these lineups consisted of the following:

1) Larry Sutton, 22, 5'8½", 135 lbs.
2) James Alford, 21, 5'7", 169 lbs.
3) Thomas White, 28, 5'7", 150 lbs.
4) Kenneth Anscombe, 18, 5'6", 147 lbs.
5) Vernon Tull, 21, 5'7", 150 lbs.

(Transcript of lineup).

Mrs. Padovani positively identified Kenneth Anscombe as the gunman:

> Mr. O'Malley: Let the record reflect the witness is Nancy Padovani. Just to make sure you understand, because I told you before, when the shade goes up and you make your viewing, indicate the number if you see somebody who looks like the person involved in the incident of October 7, 1974. Indicate by number.
>
> The Witness: I see him already, four. That's the one I said.

(Transcript of Lineup).

Mrs. Padovani recanted her identification of Anscombe when she realized that Anscombe was not Solomon. She explained this at the *Wade* hearing:

> Q. And you picked somebody out in that [the second] lineup?
>
> A. Yes. Well, I can explain about that one. He looked so much like that. They just lifted up the thing and I got frightened when I seen him because they looked like him. They pulled down the window. I told them to pull down the shade but I had specified him [Anscombe] when I had come outside. I said, "I made a mistake, it's not him he is not much too heavy." I said, "It couldn't be him. If there is any way you can forget what I said because I knew it wasn't him, but it looked like him." If you look at the pictures together, you could see they looked alike in the face.

Q. But in the second lineup, what you are saying, when you picked out that man, was that this was the number one man in the office, right?

A. (Indicating in the affirmative).

Q. In other words, this was Mr. Solomon?

A. Yes but I only seen him for one second, not even—I just got scared because I seen the facial features and I, you know, didn't really look. All I saw was the face and I walked away, run out of there because I got scared and I told them outside, "I made a big mistake because he was much too heavy, you know, Solomon was a little skinnier." (W. 81).

Moments after the second lineup ended, the third lineup was held. It consisted of petitioner and four others, all substantially larger than petitioner, and larger than Mrs. Padovani had described the gunman to be:

1) Eric Sharpe, 23, 5'8", 195 lbs.

2) Brian Ellick, 18, 6', 170 lbs.

3) Bruce Patten, 24, 6', 165 lbs.

4) Petitioner, 16, 5'6", 130 lbs.

5) Frederick Goodman, 24, 5'10", 146 lbs.

(Transcript of lineup).

Petitioner was identified by Mrs. Padovani.

### 4. *The Wade Hearing and Trial.*

At the *Wade* hearing and at the trial Mrs. Padovani positively identified petitioner as the gunman.

### B. *The Identifications by Dr. Casseus.*

#### 1. *Photographic Identifications*

The photograph of petitioner on which Mrs. Padovani drew a hood became a part

of Detective Doherty's investigation. It was shown to the other witnesses to the crime, including Dr. Casseus, usually as part of a collection of photographs.[3] It served the obvious purposes of suggesting to those witnesses that particular attention be given to that photograph, and that at least one other witness had identified the person pictured in the hooded photograph.

Dr. Casseus made two photographic identifications of petitioner within several weeks of the incident. The displays from which Dr. Casseus picked petitioner's picture contained about ten "mugshots." (W. 94). Either one or both displays shown to Dr. Casseus contained the hooded photograph. (W. 95–96). Initially, Dr. Casseus said that while he was certain he selected the "hooded photograph," he was unsure whether he did so at the first display, which was held at the police precinct, or at the second display, which took place at his office:

Ans. Somebody draw a hood

Q. On one of the pictures that was shown to you?

Ans. Yes

Q. Are you positive of that?

Ans. One that was in my office, I saw him with the hood drawn, or if in the detective office. I can't recall exactly.

Q. But on one of the two occasions the pictures that you were shown—

Ans. Right.

Q. Had a hood drawn on it?

A. Definitely. (W. 95–96).

Later, he said that he selected the hooded photo at the second display, held in his

---

3. One potential witness not used at the trial, Henrietta Clark, identified petitioner from the photograph with the hood drawn on it which was presented to her by Detective Doherty as part of a collection of five or six photographs. She later identified petitioner at a lineup on January 16, 1975. At the *Wade* hearing Miss Clark was asked if she saw in court any "of the three persons you saw in the doctor's office on that particular day." She responded: "He looks something like the defendant there." (W. 107).

At the *Wade* hearing Miss Clark testified that in making her photo identification "the hood

helped a lot." (W. 121). She further testified that when she identified petitioner in the lineup, he reminded her of the person she had seen in the hooded photograph. (W. 120–121). Her lineup identification "was really based on the picture that I saw." (W. 121–122). The court ruled "that the photograph, which was the subject of the identification by Miss Henrietta Clark, was tainted" (W. 129), and suppressed her testimony. This is, it is to be noted, the same photograph that was shown to Dr. Casseus.

office, but could not remember whether he was shown the marked photograph at the police station as well:

Q. But you don't think the photograph shown to you in the precinct, which was loose with the pile, had anything drawn on it, or might have had the hood drawn on it too?

Ans. I just could not recall that. I don't recall if I had seen it with the hood, something drawn in the precinct. I can't recall that. (W. 103).

2. *The Wade Hearing*

Dr. Casseus was present at neither the arraignment nor the lineups.

At the *Wade* hearing, Dr. Casseus could only give a very general description of the gunman: he was black and youthful, and wore a hood and sneakers.[4] He testified that the petitioner reminded him of the gunman:

Q. And did you have an opportunity at that time to look at the person who had the gun?

A. Yes.

Q. And do you see the person who had the gun in Court here today, would you look around the Court and tell us if you see the person who had the gun in Court today?

A. That fellow had a hood over his head. He reminds me of this fellow. (W. 88).

At one point, Dr. Casseus conceded that he could not positively identify petitioner as the gunman:

Q. Now Doctor, as you testified, you indicated that you looked at Mr. Solomon, and you said he looked something like the person?

A. Yes.

Q. And in effect, are you telling us that after the passage of eight months, you are unable to say with certainty that this is the person?

4. Ans. All three of them were black
  * * * * * *
Ans. They appeared youthful to me
  * * * * * *
Q. Doctor, going back to the day of the robbery, do you recall anything about the dress of the people that came in?

A. If I'm able to—

Q. I'm sorry.

A. I didn't hear you. I don't understand.

Q. Is what you are saying, when you say he looks like the person—

A. Yes?

Q. —an indication that—

Ans. Well, he doesn't have a hood now. I mean I cannot be exactly the way I saw him.

Q. So you can't be sure that this is the person?

Ans. It looks like

Q. And that's the best you could say?

Ans. Yes, because he had a hood at that time. He's not exactly the same I saw him. (W. 96–97).

In his findings at the conclusion of the *Wade* hearing, the judge described Dr. Casseus' identification as "an in-court identification, utilizing the words 'Look alike'" (W. 129).

Petitioner's most striking feature was a facial scar. None of the witnesses had reported a scar in the descriptions of the gunman that they gave to the police (W. 29–32; T. 220–223; T. 250). At the *Wade* hearing Dr. Casseus recalled no scar on any of the persons who were engaged in the incident:

Q. Now, when you went, do you recall any physical characteristics of the person in your office, could you give a description of the persons?

A. Well, it was a black kid.

Q. All three of them?

A. Beg your pardon?

Q. All three of them?

A. All three of them were black.

A. Yes.

Q. Any beards?

Ans. No.
Q. How about the hood on the man with the gun?
Ans. The hood, sneakers. That's all I can recall now. (W. 92, 93, 97).

A. No.

Q. Any moustache?

A. They appeared youthful to me.

Q. So no beards or moustaches?

A. No, I don't think so.

Q. Any scars that you noticed?

A. No, I don't think so. (W. 92–93).

### 3. *The Trial*

At the trial, Dr. Casseus positively identified petitioner as the gunman. The difficulty he had experienced at the *Wade* hearing had, remarkably, disappeared:

Q. Now, Doctor, do you see someone in the Courtroom today who was wearing the hood and had the gun and robbed you?

A. If I could step down and take a better look?

Q. Certainly. Step down.

(Whereas the witness steps down off the witness stand and walks over to the defense table and looks in the direction of the defendant.)

A. He is the person.

Q. You are sure he is the man?

A. Sure.

Q. No question about it?

A. No. (T. 244)

On cross-examination, Dr. Casseus claimed that a bad view had prevented him from identifying petitioner at the *Wade* hearing.[5]

At the trial, for the first time, Dr. Casseus recalled having seen a scar on the gunman. (T. 251). He affirmed that he had not mentioned the scar in his original description to the police; claimed he had not seen the scar at the *Wade* hearing; and claimed sudden recall:

Q. But at the time you spoke to the detective you didn't mention any scar?

A. No.

Q. Did you recall seeing a facial scar?

A. Yes, I do now.

Q. You do now?

A. Now I am seeing it, yes.

Q. Do you recall testifying several days ago in this Courtroom doctor?

A. Yes.

Q. And you recall sitting where you are now?

A. Yes.

Q. And you recall looking at Mr. Solomon across this distance?

A. Yes, but I couldn't see the scar. I can't even see the scar now.

Q. Now, is the first time you mentioned the scar to anybody today in the Courtroom?

A. That's right.

Q. And at no time in all the times you spoke to the detective you never mentioned the scar?

A. No, I was watching the gun most of the time.

Q. Now, in—did that prevent you from seeing the scar at that time?

A. No, not necessarily, I didn't see the thing but now I recall that I had seen the scar. (T. 250–251)[6]

After Dr. Casseus testified at trial, positively identifying petitioner as the gunman, petitioner's attorney moved for a mistrial on the ground that Dr. Casseus' identification testimony should have been excluded at the close of the *Wade* hearing. He pointed out that Dr. Casseus' *Wade* hearing testimony indicated that he could not make an identification—"all he could say was that Mr. Solomon was a look a like." He argued that as a result of the tentativeness of the *Wade* testimony the court did not look closely into the adverse effect of the suggestive display of the hooded photo-

---

5. Q. Could you tell this Court and this jury and myself what happened between July 9 [1975] [the date of the *Wade* hearing] and today that now makes you sure that this is the person?
   Ans. Because when I saw him July 9 I was—I seen him from here. I couldn't recognize him to [sic] well.. Now I see him there but the way it was in my office I could

recognize him now and I recall I have seen the scar. (T. 253).

6. Mrs. Padovani's description of the gunman had also changed in the course of the investigation. According to police records, her initial description did not mention a scar. At the *Wade* hearing, she claimed to remember a scar on the gunman's face. (W. 29–32, 70–71).

graph to the doctor on at least one and possibly two occasions. The trial judge denied the motion. (T. 259–260).

### C. Findings of the Trial Judge at the Wade Hearing.

The trial judge characterized the issue at the *Wade* hearing as being whether the identifications of petitioner by Mrs. Padovani and Dr. Casseus were "so unnecessarily suggestive and conducive to a mistaken case of identity, that the defendant Kenneth Solomon was denied due process of law." He identified the test to be used in determining the propriety of the procedures as one of "fairness", depending "upon the totality of circumstances."

He found that "the photo identification procedures . . . were not suggestive. And that the identification, by Mrs. Nancy Padovani and Dr. Gene Louis Casseus, emanated from the identifying witnesses." (W. 130). Under the circumstances the photographic identification was not, he found, "so unfair as to violate due process of law. And the use of the photos was not unnecessarily suggestive." He found little risk of misidentification by either Mrs. Padovani or Dr. Casseus, "who saw the perpetrator, and examined the pictures, where their memory was still fresh." (W. 131).

The judge also found that no suggestion was made to the witnesses "as to which persons in the photographs were under suspicion." He found that the witnesses and not the police were responsible for focusing the investigation on the petitioner. (W. 131). "It is only where [police action] suggests, in one form or another, verbally or circumstantially put to the witness or witnesses, that the procedure is concluded as violative of due process." He failed "to find said infirmity in the subject fact situation." (W. 132).

The judge also found that the lineup met "the constitutional tests of due process."

The judge concluded that even if he had found that any of the procedures reviewed at the *Wade* hearing violated due process, "the Court would have further found, that the People have established beyond a reasonable doubt, that the in-court identification, by Mrs. Nancy Padovani, and Doctor Louis Casseus, were based upon observations of the suspect, rather than any unconstitutional practice. That is, in-court identification was based upon an independent source."

With regard to Mrs. Padovani's arraignment identification of the defendant, the trial judge stated "that there was no unconstitutional infirmity found in the utilization at that particular procedure." (W. 133).

### IV.

Respondent urges that the findings of the state trial judge at the *Wade* hearing are entitled to the presumption of correctness prescribed by 28 U.S.C. § 2254(d). That section reads in pertinent part:

> (d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct . . . .

The trial court's on the record findings at the conclusion of the *Wade* hearing were "for all practical purposes, the equivalent of a written finding." *Jackson v. Fogg*, 465 F.Supp. 177, 184 (S.D.N.Y.1978), *aff'd*, 589 F.2d 108 (2d Cir. 1978). However, "to be accorded substantial weight," detailed findings as to both suggestiveness and reliability must be made:

> In deciding whether or not to permit a witness to make an in-court identification, a two-step process must be employed. The court must determine whether the pre-trial identification procedures employed were in fact suggestive. If it determines that those procedures were suggestive, the court must then determine whether the identification to be

made at trial was so tainted by the suggestive procedures as to be rendered unreliable, and therefore inadmissible. At this second stage, the court must evaluate the "totality of the circumstances" in light of five distinct factors—"the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation," *Neil v. Biggers, supra,* 409 U.S. [188] at 199–200, 93 S.Ct. [375] at 382, [34 L.Ed.2d 401] and determine whether there exists "a very substantial likelihood of misidentification." *Id.* at 198, 93 S.Ct. at 381, *quoting Simmons* [v. *United States*], *supra,* 390 U.S. [377] at 384, 88 S.Ct. 967.

*Jackson v. Fogg, supra* at 184.

■ Under this standard, the trial court's on-the-record findings concerning the propriety of the identification procedures were inadequate. They consist of no more than conclusions that the procedures to which Mrs. Padovani and Dr. Casseus were exposed were not suggestive. The court failed to make any specific findings concerning the factual circumstances surrounding the identifications which might have entitled the court's ultimate findings to deference. Similarly, the court's finding that the in-court identification was not tainted by the earlier procedures was not supported by an evaluation of the factors enumerated in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1973).

### V.

#### 1. *Mrs. Padovani*

Petitioner claims that Nancy Padovani's identification of petitioner at trial should have been suppressed because it was tainted

by the uncounseled arraignment "showup" which violated petitioner's Sixth and Fourteenth Amendment right to counsel.

■ The petitioner was entitled to counsel at the arraignment showup and his identification by Mrs. Padovani at that showup in the absence of counsel violated his Sixth and Fourteenth Amendment right to counsel. The trial judge's conclusion to the contrary (W. 133) was in error.

In *U. S. v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Supreme Court held the Sixth Amendment right to counsel applicable to pre-trial lineups. *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) reaffirmed the precise holding of *Wade,* but held that the right attached only "at or after the initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information or arraignment," and that the right was not applicable to identifications which were part of a "routine police investigation." *Kirby, supra,* 406 U.S. at 689–90, 92 S.Ct. at 1882. In *Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), the Supreme Court held the Sixth Amendment right to counsel applicable to a showup in the course of a preliminary hearing.[7]

■ The arraignment showup at which Mrs. Padovani identified the petitioner constituted, under New York procedure, the beginning of judicial criminal proceedings against petitioner. C.P.L. §§ 1.20(1), (8); 100.05; Art. 180 (Practice Commentary); *People v. Blake,* 35 N.Y.2d 331, 361 N.Y. S.2d 881, 320 N.E.2d 625 (1974). At that point, "the government ha[d] committed itself to prosecute," and "the adverse positions of government and defendant had solidified." *Kirby, supra,* 406 U.S. at 689, 92 S.Ct. at 1882.

---

7. Trial testimony concerning the uncounselled pre-trial identification *itself* is *absolutely* prohibited:

> That testimony is the direct result of the illegal line-up "come at by exploitation of [the primary] illegality." *Wong Sun v. U. S.,*

371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441. The state is therefore not entitled to an opportunity to show that that testimony had an independent source. *Gilbert v. California,* 388 U.S. 263, 273, 87 S.Ct. 1951, 1957, 18 L.Ed.2d 1178 (1967).

The rationales articulated in *Moore* for requiring the presence of counsel at a preliminary hearing showup are equally applicable to this case:

Counsel could have requested the hearing be postponed until a lineup could be arranged at which the victim would view petitioner in a less suggestive setting . . . Short of that, counsel could have asked that the victim be excused from the courtroom while charges were read . . . Counsel might have sought to cross examine the victim to test her identification before it hardened. . . . Because it is in the prosecution's interest as well as the accused's that witnesses' identifications remain untainted [it] cannot [be assumed] that such requests would have been in vain. *Moore v. Illinois*, 434 U.S. 220, 231 n.5, 98 S.Ct. 458, 465, 54 L.Ed.2d 424 (1977).

■ The violation of petitioner's right to counsel at the showup does not call for *per se* exclusion of the subsequent in-court identification. Instead, it puts a burden on the government to establish "by clear and convincing evidence that the in-court [identification was] based upon observations of the suspect other than the" arraignment showup. *Wade v. United States*, 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967).

■ In determining whether the government has met its burden the court must consider at least the following factors, enumerated by the Court in *Wade*:

. . . the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup. 388 U.S. at 241–242, 87 S.Ct. at 1940.

a) *Mrs. Padovani's Opportunity to Observe the Hooded Gunman During the Crime*

Mrs. Padovani was the first person to confront the assailants as they entered the office. When the gun was drawn, she immediately led them back to Dr. Casseus who surrendered money and his watch. The assailants locked the doctor in a supply closet with Henrietta Clark, a patient, who had been sitting in the waiting room during the robbery. Then the sexual assault occurred. The entire incident lasted ten to fifteen minutes (W. 52).

Mrs. Padovani's best opportunity to observe the gunman would have come during the sexual assault. The gunman stood behind Mrs. Padovani for part of the attack. (W. 68). Mrs. Padovani never got a full look at the gunman because his face was partially covered by the parka hood.[8] Thus, features which could have helped identify the gunman—his hairline, ears and the general shape of his head, were hidden. *Compare with Neil v. Biggers*, 409 U.S. 188, 200–201, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (rape victim who had been in the presence of her assailant for up to half an hour, first under artificial light in her house and then later under a full moon outdoors "had an unusual opportunity to observe and identify her assailant.") *But see Coleman v. Alabama*, 399 U.S. 1, 3–6, 90 S.Ct. 1999, 2001, 26 L.Ed.2d 387 (1970) (in-court identification by a witness who had a fleeting but "real good look" at the assailant in the headlights of a passing car, held admissi-

8. Q. Now with respect to the hood that you indicated the first person had on, approximately how much of the face was obscured? Were the ears covered?
Ans. Yes.
     *    *    *    *    *    *
Q. So there was a ring around the face?
A. Yes.
2. You couldn't see the entire chin?
Ans. Yes, I could see the chin. I could see everything, except his head. That's the only thing I couldn't see, and his ears. (W. 62–63).

ble). Mrs. Padovani had, in sum, a fair opportunity to observe the gunman, but various identifying features were obscured.

b) *Discrepancies Between Mrs. Padovani's Pre-Showup Description of the Gunman and Petitioner's Actual Description*

Mrs. Padovani's initial description of the gunman was extremely general: black male, 21, 5'7", 145 pounds, dressed in a blue parka hood, beige work shoes, and blue dungarees. No scars or other unique features were mentioned.

Petitioner at the time was 16, 5'6" and 130 pounds, and he had a scar above his left eyebrow. While at the *Wade* hearing Mrs. Padovani insisted that she mentioned a scar to Detective Doherty, she does not remember when or where (W. 71). Police reords indicate that she said nothing about a scar, (W. 29-32), and Detective Doherty testified that he would have made note of any distinctive marking that Mrs. Padovani mentioned (T. 221-222).

c) *Other Identifications*

In addition to the arraignment identification, Mrs. Padovani made two other pre-trial identifications of the petitioner: a photographic identification before the arraignment showup and a lineup identification after the showup. The lineup identification was presumptively tainted by the prior uncounseled showup. To hold otherwise would be to bootstrap a finding of reliability on an identification the reliability of which was itself undermined by the challenged procedure.

An unequivocal prior photographic identification by Mrs. Padovani would be a circumstance tending to establish the reliability of her in-court identification.

There was nothing suggestive about the original photographic array presented to Mrs. Padovani. It contained over 200 photographs of black males—all mugshots, full face and profile, of the same size.

Petitioner's photograph was one of five Mrs. Padovani selected to take a close look at. Detective Doherty's testimony indicates that Mrs. Padovani drew the hood on a copy after he read the material on the back of the original (W. 11), which included petitioner's name (W. 11; W. 31). Both Mrs. Padovani and Police Detective Doherty, who was present at the identification, testified that Mrs. Padovani positively identified petitioner's photograph. Mrs. Padovani's testimony indicates that her identification became positive when she drew a hood on the photograph (W. 73). On the report made out by Detective Doherty the identification was described as "possible."

I find that the tentativeness of the photographic identification diminishes its utility as an indicator of the reliability of the later in-court identification. I find, moreover, that the drawn-in hood was suggestive and rendered the identification of dubious value. Had Mrs. Padovani drawn similar hoods around some of the other mugshots, she would have found several who resembled her assailant; once the hairline, ears and shape of the head are obscured, individuals become much more difficult to distinguish. In addition, her psychological response to the sight of a hooded face could not but have increased the likelihood of misidentification.

An indication of the lack of reliability of the photo identification was the later lineup identification of Kenneth Anscombe. While Mrs. Padovani subsequently retracted the latter identification, it casts further doubt on her reliability as an eyewitness—particularly in light of the fact that it took place after both the photographic identification and the showup. As explained more fully below, had a hood been drawn around Anscombe's photo, his resemblance to the defendant would have been even more striking.

d) *The Time Lapse Between the Incident and the Arraignment Showup*

The arraignment was conducted 11 days after the incident. *Compare with Neil v. Biggers*, 409 U.S. 188, 201, 93 S.Ct. 375, 383, 34 L.Ed.2d 401 (1972) (in-court identification allowed despite a time lapse of seven months between the incident and the corporeal pre-trial identification.)

#### e) *The Arraignment Showup*

Mrs. Padovani had been twice exposed to petitioner's photograph between the time of her original identification of petitioner's photograph and the time of the arraignment showup: once the night before the showup and once just before the arraignment. Under the circumstances, she was "apt to retain in [her] memory the image of [petitioner] rather than of the person actually seen, reducing the trustworthiness of subsequent . . . courtroom identification[s]." *Simmons v. United States*, 390 U.S. 377, 383–384, 88 S.Ct. 967, 970, 19 L.Ed.2d 1247 (1967).

Petitioner was led before the arraignment court in police custody and without counsel and exhibited in full view of Mrs. Padovani for 20 to 30 minutes. (T. 183). This was an "impermissibly suggestive" way to conduct the identification proceeding. *Jackson v. Fogg*, 465 F.Supp. 177 (S.D.N.Y.), *affirmed*, 589 F.2d 108 (2d Cir. 1978). (Identification procedures found "impermissibly suggestive" where three of the witnesses were afforded a pre-lineup opportunity to see the suspect either alone or in the company of detectives whom they knew to be working on the case).

#### f) *Mrs. Padovani's Identification of Kenneth Anscombe*

Mrs. Padovani's lineup identification of Kenneth Anscombe as the gunman, well after her photographic and arraignment identifications of petitioner, casts doubt on the reliability of her in-court identification of petitioner. The identification of Anscombe, standing by itself, might not seriously erode the strength of Mrs. Padovani's more frequent identifications of petitioner. Anscombe, however, has been indicted in connection with two other armed robberies in the same neighborhood. Indicted along with him was Clayton Smalls—also identified by Mrs. Padovani in connection with the crimes in the doctor's office. (*See* p. 1137, *supra*). Anscombe and Solomon share the same first name; Mrs. Padovani's testimony that she heard her assailant's companions refer to him as "Kenny", then, is consistent with the guilt of either. The physical resemblance between Solomon and Anscombe is fairly striking; their facial features are very similar and the features which distinguish them—hairline, shape of the head, width of face—would have been largely obscured by a hood.[9]

Anscombe (18, 5'6", 147 pounds, no scar) more precisely fit the description of the gunman furnished to the police (21, 5'7", 145 pounds, no scar mentioned) than did petitioner (16, 5'6", 130 pounds, scar above his left eyebrow). The pictures of the two are similar. As Mrs. Padovani testified at the *Wade* hearing, "[i]f you look at the pictures, together, you could see they looked alike in the face." (W. 81). Mrs. Padovani retracted her identification of Anscombe because his appearance differed from that of Solomon, not because his appearance differed from that of her assailant: "I made a big mistake because he was much too heavy, you know, Solomon was a little skinnier." (W. 81).

#### *Conclusions as to Mrs. Padovani's In-Court Identification*

■ Under the totality of the circumstances, I find that the state has not sustained its burden of proving by clear and convincing evidence that the in-court identification by Mrs. Padovani was reliable.

I find, in fact, that unreliability permeates the identification procedure from beginning to end. Mrs. Padovani's original description was of someone 15 pounds heavier than petitioner, who wore a hood which concealed various identifying features. Her description contained no reference to a facial scar, which would not have been concealed by the hood. Mrs. Padovani's identification of a photograph of petitioner became more positive when she learned that his name was Kenneth and when she drew a hood on a duplicate of the photograph. Prior to identifying petitioner at an un-

---

**9.** Mrs. Padovani herself testified that the pictures of the two reveal that they "looked alike in the face." (W. 81).

counseled arraignment showup, Mrs. Padovani was suggestively exposed to his photograph on two occasions. The arraignment showup itself exposed petitioner and his scar to her for an extended period of time, and from that point on any future identifications were at least presumptively poisoned by that exposure. The subsequent identification of Anscombe, also named "Kenneth," who fit Mrs. Padovani's original description to the police more closely than did petitioner, was ultimately retracted on the grounds that he was heavier than petitioner. By this time Mrs. Padovani knew petitioner and his identifying features well, and the state has not established by clear and convincing evidence that her courtroom identification had an independent basis.

### 2. Dr. Casseus

The petitioner also claims that his courtroom identification by Dr. Casseus should have been suppressed because it was tainted by a suggestive photo identification procedure.

Dr. Casseus made photo identifications of petitioner on two occasions. The first was at the police precinct on October 11, 1974, several days after the crime. The second was in Dr. Casseus' office several weeks after the crime. On one and possibly on both of these occasions the photo display included the duplicate of petitioner's mugshot on which Mrs. Padovani had sketched a blue parka hood. Not surprisingly, Casseus selected the "hooded photograph" of petitioner.

■ This procedure was impermissibly suggestive. See Simmons v. U. S., 390 U.S. 377, 383, 88 S.Ct. 967, 970, 19 L.Ed.2d 1247 (1968) (photographic display which in any way "emphasizes" the photo of one suspect creates danger of misidentification). The marking on the photograph not only suggested that petitioner was the hooded gunman, but conveyed the unmistakable message that somebody else had already reached the same conclusion. No valid goal of law enforcement could have been served by this procedure.

In the context of this case, the *Wade* hearing identification procedure was itself suggestive. The Second Circuit has held that showups generally are unnecessarily suggestive. *Jackson v. Fogg*, 589 F.2d 108, 111 (1978); *Lucas v. Regan*, 503 F.2d 1, 4 (2d Cir. 1974). In-court identifications where, as here, the suspect is the obvious target of the proceedings being conducted, are particularly suggestive. *See Moore v. Illinois*, 434 at 229, 98 S.Ct. at 465 ("It is difficult to imagine a more suggestive manner in which to present a suspect to a witness" than in the context of a preliminary hearing when the suspect is led before the bench and the evidence against him is recited). The presence of counsel at this *Wade* hearing does not make it less suggestive. Counsel could, of course, have requested a lineup at this stage and did not.

■ Under the totality of the circumstances, I find that these two suggestive procedures so tainted the in-court identification as to render it unreliable. *Jackson v. Fogg, supra.*

Some of the factors to be considered in determining whether such suggestive identification procedures render any in-court identification unreliable were set out by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972):

> the opportunity of the witness to view the criminal at the time of the crime, the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

### a) Dr. Casseus' Opportunity to View the Gunman at the Time of the Crime

At the *Wade* hearing, Dr. Casseus testified that he was in the presence of the assailants for ten minutes. (W. 92). Mrs. Padovani, however, testified that the robbery of the doctor took only three or four minutes. (W. 65). When Casseus did look at the gunman, his view was limited by the parka hood.

Dr. Casseus' testimony that his eyes were fixed on the gun (*supra*, p. 11) suggests, understandably, that he was extremely frightened during the robbery. The doctor, who feared for his life, must have been preoccupied with survival. His recollection of the incident could easily have been distorted by the circumstances.

*b) Discrepancies Between Dr. Casseus' Pre-trial Descriptions of the Gunman and Petitioner's Actual Description*

Dr. Casseus, like Mrs. Padovani, gave police an extremely general description of the gunman. Moreover, Casseus did not mention anything about a facial scar until trial. At the *Wade* hearing Dr. Casseus could not positively identify petitioner as the gunman, because the gunman was wearing a hood.[10] He could not remember a scar. At the trial his testimony mysteriously flip-flopped: Dr. Casseus positively identified petitioner as the gunman, and he remembered a scar. His explanation for his inconsistent testimony is worth repeating:

Q. Now, is the first time you mentioned the scar to anybody . . . in the courtroom?

A. That's right.

Q. And at no time in all the times you spoke to the detective you never mentioned the scar?

A. No, I was watching the gun most of the time.

Q. Now, in—did that prevent you from seeing the scar at that time?

A. No, not necessarily, I didn't see the thing, but now I recall that I had seen the scar. (T. 251).

This is simply not an adequate explanation for the doctor's change of testimony. A more reasonable explanation is that Dr. Casseus, probably unconsciously, tailored his trial testimony to fit petitioner's distinctive appearance at the *Wade* hearing.

*c) The Level of Certainty Demonstrated by Dr. Casseus at the Identifications*

There is nothing in the record to indicate the degree of certainty demonstrated by Dr. Casseus at the time he made the photo identifications, except testimony that his identification was "positive." (W. 12). His great uncertainty at the time of the *Wade* hearing is manifest.

*d) Other Identifications*

Were it clear from the record that the second photo identification was the only one tainted by the use of the hooded photograph, the prior untainted identification might be an important indicator of the reliability of Dr. Casseus' in-court identification. Dr. Casseus' testimony at the *Wade* hearing, however, casts considerable doubt on the existence of any prior untainted identification.

*e) The Length of Time Between the Crime and the Photo Identifications*

Both the photographic sessions were held within a few weeks of the crime.

*Conclusion as to Dr. Casseus' In-Court Identification*

Under the totality of the circumstances, I find that the in-court identification of Dr. Casseus was unreliable. His tentativeness at the *Wade* hearing, even after exposure to an impermissibly suggestive photographic procedure, demonstrates a persistent uncertainty concerning the identity of the gunman. Through the failure of the State to secure a lineup identification, a procedure which became especially advisable following Mrs. Padovani's identification of Anscombe, that uncertainty was never, prior to the *Wade* hearing, put to the test.

Clearly, however, exposure to petitioner at the *Wade* hearing made possible Dr. Casseus' unequivocal identification at trial of petitioner as the gunman.

Dr. Casseus' explanation for discrepancies between his earlier testimony and his testi-

---

10. Dr. Casseus explained his change of testimony by saying that he could not see the petitioner well enough at the *Wade* hearing to make a positive identification. *See* n. 5. At the *Wade* hearing, however, he said that he was unable positively to identify petitioner because his assailant had been wearing a hood. At no time did he ask to take a closer look at the petitioner.

mony at trial—discrepancies concerning his certainty in identifying the petitioner and his recollection of a scar—was simply not credible. It is much more reasonable to infer that he succumbed to the cumulative power of the suggestive procedures to which he had been exposed. Balanced against these indicia of unreliability are Dr. Casseus' rather limited opportunity to view the assailant and the possibility that he may have made one untainted photographic identification. Under the totality of the circumstances, that evidence is too slight to have warranted the admission of his identification testimony.

SO ORDERED.